70 N.J. Super. 63 (1961)
174 A.2d 907
EMILY BRODZINSKI, EXECUTRIX OF THE ESTATE OF STANLEY PULEK, DECEASED, PLAINTIFF,
v.
ISABELLA PULEK, BLOOMFIELD SAVINGS BANK, A BANKING INSTITUTION OF THE STATE OF NEW JERSEY, AND PEDDIE REALTY COMPANY, A NEW JERSEY CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 24, 1961.
*66 Mr. Felix Rospond appeared for plaintiff (Messrs. Rospond & Rospond, attorneys).
Mr. Victor H. Miles for defendant Isabella Pulek.
Mr. Peter J. Cass appeared for defendant Bloomfield Savings Bank (Messrs. Cass and Cass, attorneys).
Mr. August Landi appeared for defendant Peddie Realty Co. (Messrs. Landi & Madden, attorneys).
MINTZ, J.S.C.
The plaintiff seeks an adjudication of the interests of the respective litigants in and to a certain bond and mortgages. She is the executrix under the will of her late father, Stanley Pulek, and contends that he and his wife, defendant Isabella Pulek, held said securities as tenants in common. Defendant contends that they were joint tenants and upon Stanley's death she acquired the absolute interest in the same.
The late Stanley Pulek and the defendant, Isabella Pulek were married in May, 1952. Each had been previously married. He died on September 10, 1960. Prior to said marriage Stanley operated a tavern and restaurant known as Stanley's Anchor Inn at 105 Hawthorne Avenue, Newark, N.J. Upon their marriage the defendant took an active interest in the operation of the business which subsequently prospered. In November 1953 they acquired the stock interest in Peddie Realty Company, the corporation which owned the real estate upon which the business was conducted and which subsequently acquired an adjoining parcel. In 1955 the tavern license was issued in the names of Stanley and Isabella jointly and presumably they operated the business as partners. The Peddie Realty Company stock was equally distributed between the decedent and the defendant.
*67 The marriage was a rocky one. On July 16, 1954 they entered into a separation agreement prepared by Michael L. Mango, who essentially was Mr. Pulek's attorney but on occasion represented both of them in connection with their marital affairs. The defendant returned to her husband in December 1954 and together they worked hard in the business.
In December 1959 decedent was anxious to sell the business and ultimately the defendant wife concurred. An agreement of sale was entered into dated December 8, 1959 with John Peterson and William Speros. This agreement provided for the sale of all the issued shares of stock of the Peddie Realty Company and all their right and title in the tavern and restaurant, including the liquor license, for the sum of $240,000. There was a down payment made of $40,000. Title was closed on January 5, 1960. Pursuant to the contract at the closing, the following instruments, the subject of this litigation, were delivered to the decedent and his wife:
(a) Bond  Peddie Realty Company to Stanley Pulek and Isabella Pulek in the principal sum of $200,000 with interest at 5%, said principal and interest payable in monthly installments of $1,283.44 for a 21-year period.
(b) Real estate mortgage from Peddie Realty Company to Stanley Pulek and Isabella Pulek in the principal sum of $200,000, providing for the same monthly payments as prescribed in the bond.
(c) Chattel mortgage from Stanley's Anchor Inn Corp. to Stanley Pulek and Isabella Pulek covering the fixtures and equipment in the tavern and restaurant premises, likewise in the principal sum of $200,000 and providing for the same monthly payments.
Plaintiff contends that the decedent and his wife Isabella intended to create a tenancy in common, that a joint tenancy was never intended and consequently the instruments should be reformed so as to express the mutual intent of the parties. Plaintiff further asserts that assuming a joint tenancy was intended and established, the subsequent conduct of the parties effected a severance so that at the time of decedent's death, the parties were tenants in common in the subject bond and mortgages.
*68 N.J.S.A. 46:2D-1 provides:
"When any mortgage, covering real estate or chattels or both, shall hereafter be made and executed to, or assigned to, any husband and wife, such mortgage shall be held by such husband and wife as joint tenants and not as tenants in common, both as to the legal estate and the beneficial interest or debt thereby secured, unless otherwise therein provided."
Clearly under the cited statute the securities were held by the decedent and his wife as joint tenants. Plaintiff asserts that there was a mutual mistake as to the legal consequences of the instruments. Mr. Mango testified that while he did not directly inquire from his clients (as he should have) as to what type of tenancy they desired to create, he gathered from their conduct and the surrounding circumstances that their intent was to hold the bond and two mortgages as tenants in common. He further testified that he was unaware of the cited statute at the time the instruments were drafted and executed, and that he intended to create a tenancy in common.
At the closing of title the Puleks requested the buyers to make out separate checks to each of them for one-half of the monthly payments. They did so for a brief period until the Puleks made other arrangements with the Bloomfield Savings Bank. Apparently Mr. Mango received some of the checks made payable to Mrs. Pulek, for he remitted a few monthly payments to her each in the sum of $641.72. On May 4, 1960 the Puleks entered into an agreement with the Bloomfield Savings Bank, whereby the bond and mortgages were delivered to the Bank as custodian. Under that agreement the Bank received the monthly payments and remitted one-half to defendant and one-half to decedent.
In December 1959 decedent and his wife purchased residential premises at 255 Newark Avenue, Bloomfield, N.J. with funds out of their joint savings account. Shortly after the closing of title to the tavern-restaurant, decedent and defendant vacationed together in Florida for about 6 weeks *69 and continued their joint checking account at the Hillside National Bank. From February 1960 to May 1960 decedent withdrew substantial sums out of this account for his separate use. The decedent was described as a shrewd, sporty and generous business man. Differences again arose between decedent and defendant and they entered into a second separation agreement dated May 31, 1960. Notwithstanding this agreement, decedent frequently socialized with his wife. He sent her notes and flowers every few days until his death.
There was also testimony by a former waitress at the tavern that defendant in December 1959 stated she did not care what happened to her husband, that she was going to get her money and "take off." When the contract was signed decedent and his wife celebrated the occasion with a dinner at an Orange restaurant operated by his daughter (the plaintiff-executrix herein) and her husband. The latter testified that on that occasion the defendant stated that she and her husband would each get a one-half interest free of each other, and that they had arranged to receive separate checks. Mr. Peterson, one of the purchasers of the tavern-restaurant, testified that the day following the closing Mr. Pulek asked him to buy his one-half interest in the mortgages.
Defendant testified that a husband-wife mortgage was intended and that she wanted separate monthly checks because of her husband's generous disposition. She wanted to assure herself an adequate sum to maintain herself and the household, and beyond that her husband could use his share of the monthly payment for his own purposes. In the course of the marriage, defendant advanced substantial sums of money to her husband in the operation of the business, as well as for the acquisition of the business property on Hawthorne Avenue. She also advanced her personal funds to assist the Brodzinskis in acquiring their restaurant. Admittedly the Brodzinskis repaid such advances.
After decedent's death, Mr. Mango called upon defendant and submitted to her a typewritten sheet which he told her to substitute for one in the May 31, 1960 separation agreement. *70 In this proposed insert Mango specifically provided that in the event Stanley predeceased defendant, she was to receive his one-half interest in the mortgages to her absolute use. Mango at the time was in serious straits. He had embezzled over $22,000 of defendant's funds as well as thousands of dollars of several other clients' funds. The proposed insert was submitted to defendant on condition she forget about his embezzlement. Mrs. Pulek refused his proposition telling Mango that she wanted only what was coming to her. Mango's testimony respecting the proposed insert sheet was incredible.
After the 1960 separation agreement decedent continued to drink heavily, needed money, and was unhappy in being without a business. He constantly solicited defendant for funds and to go into business with him. On September 8, 1960 she left a note for him reading as follows:
"Sept. 8, 1960
Stan,
Please do not bother me again, as I can't take it. My nerves are all on edge, and I don't want to go to the Hospital again.
Stan I don't want to take any part of your mortgage as I have my own and I want my cash for myself for the stock market. I gave you more than half of all my money. I can't do any more.
Betty."
Equitable relief will be granted when the misapprehension of a party concerning the legal effect of a transaction in which he engages is accompanied by inequitable conduct of the other party. A court of equity will not permit one party to take advantage of a mistake of law by the other which he knew of and did not correct. 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 847; see Downs v. Jersey Central Power & Light Co., 117 N.J. Eq. 138 (E. & A. 1934). Equity will also afford appropriate relief if, after making an agreement, in the process of reducing it to a written form, the instrument by means of a mistake of law fails to express the contract which the parties actually entered into. 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), *71 § 845. In Kuller v. Fire Ass'n of Philadelphia, 124 N.J. Eq. 473, 475 (Ch. 1938), the court stated:
"The adjudicated cases, in this State at least, have uniformly held that a court of equity will not grant the high and extraordinary remedy of reformation except upon the production of proof, clear, convincing and free from doubt, that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be; and as, in fact, it was but for the alleged mistake in its drafting."
The same quantum of proof is required where reformation is sought on the ground of unilateral mistake and inequitable conduct of the defendant with respect thereto. Asbestos Fibres, Inc. v. Martin Laboratories, Inc., 12 N.J. 233 (1953).
Plaintiff has failed to sustain her burden of proof. The testimony as to the surrounding circumstances and conduct of the parties does not establish the fact that they intended anything other than what was actually written. Defendant was not charged with any inequitable conduct in the transaction in question. There was no proof as to any discussion at the signing of the contract or closing of title with respect to the incident of survivorship and no discussions were held that would negate the idea of survivorship. Reformation cannot be predicated upon sheer speculation as to what the parties would mutually have intended had the matter been brought to their attention. Simply stated, where the parties have not considered the consequences of death, there is no mistake of law or fact and the cited statute is controlling.
Plaintiff further urges that if a joint tenancy was initially established, it was terminated in decedent's lifetime, hence the parties were tenants in common at his death. Plaintiff urges that the separate monthly payments and the May 31, 1960 separation agreement effected a termination of the joint tenancy. As already observed, the arrangement for separate checks was a device resorted to by the wife to preserve part of their estate from the spending tendencies of her late husband. The custodian agreement with the *72 bank did not effect a severance, but merely delegated to the bank the duty of collecting the payments and certain management details for the mutual benefit and convenience of both parties. There is no express provision in that agreement providing for a severance of the joint tenancy, but on the contrary the existing status is not altered since the parties thereto expressly agreed that:
"This custodian account may be terminated by either party at any time and we may add to the principal or withdraw securities against proper written receipt as we see fit."
The separation agreement of May 31, 1960 is significantly silent with respect to any severance of their joint tenancy in their principal assets. The agreement recites a consideration of $50,000 from the defendant to decedent and in part provides for the relinquishment by the decedent of all claims and interest in any of the defendant's "money, jewelry, furniture, household goods or any other asset that she now has" so that "she may enjoy an absolute power of disposition over the same as though she was feme-sole and unmarried." It further provides for the decedent to convey his interest including his right of curtesy in the property at 255 Newark Avenue, Bloomfield, to defendant as well as his "right, title and interest in any other asset" belonging to her. No such conveyance was made by decedent. In the earlier separation agreement of July 16, 1954 the parties considered the contingency of death as to a portion of their property. Significantly in the May 31, 1960 agreement the effect of death of one of the parties to the agreement is not considered. Their principal assets, namely, the $200,000 bond and mortgages, are not specifically dealt with in the agreement. I do not believe that the parties intended to alter their interests in such items by implication. The conspicuous omission of any reference to these assets impels the conclusion that the parties did not by that agreement intend to disturb their joint tenancy.
*73 Divorce will of course convert an estate by the entirety into a tenancy in common, but a mere separation, whether voluntary or judicial, will neither destroy the estate nor change its essential characteristics. Dorf v. Tuscarora Pipe Line Co., Ltd., 48 N.J. Super. 26, 32 (App. Div. 1957). Similarly, a mere separation of husband and wife will not destroy a joint tenancy in any chattel mortgage or real estate mortgage. I find that the plaintiff has failed to sustain the burden of proving termination of the joint tenancy in decedent's lifetime.
Plaintiff challenges the constitutionality of N.J.S.A. 46:2D-1 on the ground that the statute, taken literally, renders inquiry into intent irrelevant; hence it is a denial of due process of law. Without passing upon the validity of this asserted constitutional objection in an applicable situation, suffice it to say that the subject statute is no bar to an action for reformation where the proofs may establish that the parties intended to acquire the mortgages as tenants in common. See In re Kolbeck, 27 N.J. Super. 135 (App. Div. 1953). The statute is adjudged constitutional.
Plaintiff-executrix further asserts that the creation of the joint tenancy was in fraud of the decedent's creditors in contravention of R.S. 25:2-10. An executor of a fraudulent transferor may sue to recover property transferred to the extent necessary to pay the claims of defrauded creditors where the estate is insolvent and where creditors have not already enforced their rights. Duttkin v. Zalenski, 136 N.J. Eq. 81 (Ch. 1945). However, there was no proof presented to sustain such a finding of fraud. The testimony clearly indicates that at the time of the execution of the bond and mortgages on January 5, 1960, and for some time thereafter, decedent was solvent. The fact that at the time of Mr. Pulek's decease he may have been insolvent does not in any way taint the validity of the joint tenancy at its inception. In any event, the creation of the joint tenancy was not a "conveyance" within the purview of R.S. 25:2-7. Reynolds v. Danko, 134 N.J. Eq. 560 (Ch. 1944).
*74 Plaintiff further urges that N.J.S.A. 46:2D-1 is inapplicable since it conflicts with R.S. 42:1-8 which provides that "unless the contrary intention appears, property acquired with partnership funds is partnership property." Concededly, Mr. and Mrs. Pulek conducted the business as partners; but the mortgages were given to Stanley and Isabella Pulek, who were husband and wife, and not as partners. Furthermore, the partnership was dissolved upon the sale of the business and the express will of the parties, N.J.S.A. 42:1-31(1) (b), and the partnership assets distributed to them. R.S. 42:1-38(1).
While in the complaint and pretrial order the plaintiff sought an accounting of securities in the defendant's name allegedly purchased with partnership assets, this claim was not urged at the trial and no proof was presented to warrant such accounting.
Defendant counterclaims for the return of certain items of personalty, including a chest of drawers and a fur jacket, belonging to her and allegedly in the possession of the plaintiff who denied holding same. Defendant has not sustained the burden of proof as to this claim, recovery for which is accordingly denied. She further counterclaims for reimbursement of moneys paid for past due insurance premiums on the tavern-restaurant, as well as for indemnification against income tax claims of the Federal government that may arise as a result of the sale of the business, and for advances made by her to satisfy a mortgage due on the business property. In view of the hopeless insolvency of decedent's estate, these claims are of practical inconsequence, yet the pleadings and proofs call for their resolution. Defendant relies upon the final separation agreement which provides:
"The said Stanley Pulek hereby covenants and promises to pay all outstanding indebtedness which is now due from him or both parties including all income taxes due the U.S. Government if any from the sale of the tavern at Hawthorne Ave. Newark, N.J. and that said Stanley Pulek will indemnify and save her harmless of and from all debts contracted by him."
*75 Pursuant to said agreement the defendant is entitled to reimbursement for insurance premiums paid in the sum of $927.48 and is entitled to be indemnified for any income tax claim that may be established against her in connection with the sale of the business. Brief reference was made by Mrs. Pulek to litigation instituted by the purchasers of the business against her. The nature of this litigation was not indicated and sufficient testimony was not adduced to sustain a finding that she would be entitled to reimbursement within the purview of the agreement.
Mr. Mango embezzled funds of decedent and defendant, entrusted to him for the purpose of paying off certain mortgages on the business property. Consequently defendant was required to advance $23,799.04 of her personal funds to satisfy a real estate mortgage on the business premises. While the parties did not contemplate such embezzlement, defendant under the cited agreement is entitled to reimbursement from decedent's estate for such advances.
An appropriate form of judgment will be submitted consented to as to form, or to be settled on notice.