120 N.J. Super. 357 (1972)
294 A.2d 253
SHELL OIL COMPANY, A CORPORATION OF THE STATE OF DELAWARE, AUTHORIZED TO TRANSACT BUSINESS IN THE STATE OF NEW JERSEY, PLAINTIFF,
v.
FRANK MARINELLO, DEFENDANT. FRANK MARINELLO, DOING BUSINESS AS GARDEN SHELL STATION, PLAINTIFF,
v.
SHELL OIL COMPANY, A DELAWARE CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division Superior Court of New Jersey, Chancery Division.
Decided July 21, 1972.
*363 Mr. Andrew S. Polito and Mr. Michael Loprete, for plaintiff-defendant Shell Oil Company (Messrs. Mattson, Madden, Polito & Loprete, attorneys)
Mr. Joseph R. Mariniello, for defendant-plaintiff Frank Marinello (Messrs. Fierro, Fierro & Mariniello, attorneys)
GELMAN, J.J. & D.R. Ct. (temporarily assigned).
This controversy concerns the relationship between a major oil company and one of its service station dealers. Plaintiff ("Shell") is a major producer of petroleum products, including automotive gasoline, oils and lubricants. Its products are sold to the public under the trademark "Shell" through hundreds of service stations throughout the State. In many instances Shell controls the properties on which its stations are located through long-term leases, and its practice as reflected by the record here has been to enter into sub-leases with individuals who operate the stations.[1] Coincidentally with the execution of a station lease Shell enters into a dealer agreement with the tenant-operator which in substance provides that the latter will purchase gasoline from Shell and Shell licenses him to use its trademarks in the operation of his dealership.
Prior to July 24, 1959 defendant Frank Marinello was approached by a representative of Shell to become a Shell dealer at an existing Shell station at the intersection of Route 5 and Anderson Avenue in Fort Lee. At the time he was told that the station was "run-down," that it needed *364 a "good operator," and that if he could "build it up" he would have a good business with a "future."
[The court reviewed the evidence and background of dealings between the parties for the period from 1959 to April 1969.]
Almost all contact between Shell and Marinello was carried on through Shell's dealer representatives. Dealer representatives are at the first level in Shell's marketing organization and it is their function to call regularly on dealers in their assigned territories and to sell to the dealers Shell products such as tires, batteries and accessories ("TBA"). The dealer representatives are also supposed to assist their dealers in any problems the dealers might have and to suggest improvements in the dealers' methods of operating their stations. The dealer representatives also make surveys of their territories to see what the competition is doing as to prices and volume of gas being pumped and they report this information back to their superiors in the Shell marketing organization.
Marinello has had 11 different dealer representatives in his 13 years as a Shell dealer. He testified that it was their practice to call on him about once a month and solicit orders for Shell TBA. They would urge him to buy more, and some would mention that they had a sales "quota" to meet. On occasion the representatives would also register complaints about conditions at the station, such as lack of inventory, dirty rest-rooms, a dirty window, the presence of a wrecked or unlicensed car in the rear of the station, excess garbage, uncut grass and the like.
Throughout the period prior to June 1, 1969 Marinello's leases required that he keep the station open from 6 A.M. to 12 P.M. For at least the past three years he employed between three and four full-time employees for the day shift, and part-time employees covered the station during the evening hours. In addition, in 1967 he engaged a service company which does the heavy cleaning of and supplies the rest-rooms once every two weeks, a window washer who cleans the office windows twice a month, and a private scavenger service which collects refuse and garbage twice weekly.
*365 In April 1969 new lease and dealer agreements were prepared by Shell on its forms and submitted to Marinello by his dealer representative. As originally submitted the agreements called for the standard one-year term but contained a significant change in that Shell required him to be open 24 hours a day or the maximum number of hours permitted by local zoning ordinances. The rent was fixed at one and three-fourths cents (1.75¢) per gallon delivered to the station if open on a 24-hour basis, or if this requirement was not adhered to, the rent was fixed at two cents (2.0¢) per gallon. The minimum monthly rent was set at $1000, as against $850 per month under the prior lease.
Marinello told his dealer representative, James Bishop, that he was unhappy with the rent provisions and a meeting was arranged between Marinello and Wayne Rigg. Rigg at the time was the sales supervisor for the Newark District and had been transferred to this position in November 1968. The meeting took place on May 23, 1969, and it resulted in no change in the lease provisions except that the term was increased from one year to three years, for both the lease and the dealer agreement. According to Rigg, between the time the agreements had been prepared by Shell and the date of the meeting Shell's policy had changed so that dealer leases were granted for a three-year term rather than one year. The lease and the dealer agreement were signed by Marinello and Shell at the conclusion of the meeting.
Article 2 of the 1969 lease provided that:
The term of this Lease shall be a primary period beginning on June 1, 1969, and ending on May 31, 1972, and from year to year thereafter, but may be terminated by Lessee at any time by giving Shell 90 days' notice and by Shell at the end of the primary period or of any such subsequent year by giving Lessee at least 30 days' notice.
The corresponding provision of the dealer agreement states:
This Agreement shall be in effect for a primary period beginning on June 1, 1969, and ending on May 31, 1972, and from year to *366 year thereafter, but may be terminated by either Dealer or Shell at any time by giving the other at least 10 days' notice.
The remaining pertinent provisions of the lease are Articles 5, 7, 9, 11 and 12. Article 5 provides with respect to hours of operation that:
* * * the station shall be kept open for the sale of such products by Lessee at least from 24 hours (A.M. to ____ P.M. each day excepting none. In the event 24 hours operation is zoned out, hours will be 6 A.M. to 12 P.M. each day with no exceptions or the maximum allowable hours.
Article 7 states that:
Lessee shall at all times maintain the premises (including adjacent sidewalks and ways) in good condition and repair, and keep the same, as well as Lessee's own property thereon, neat, clean and orderly.
Article 9 deals with remedies available to Shell and states in pertinent part:
In the event * * * (b) Lessee defaults in performance or observance of any covenant or condition of this lease (other than the payment of rent) * * *, and fails to remedy same within 15 days after Shell gives Lessee notice thereof * * * Shell may, as its option and without notice, terminate this lease and re-enter and repossess the Premises. * * * At any termination of this lease, Lessee shall peaceably surrender possession of the Premises to Shell.
Article 11 is captioned "LESSEE`S BUSINESS" and states that:
Nothing in this Lease shall be construed as reserving to Shell any right to exercise any control over, or to direct in any respect the conduct or management of, the business or operations of Lessee on the Premises; but the entire control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this Lease. Neither Lessee nor any person performing any duties or engaged in any work on the Premises at the request of Lessee Shall be deemed an employee or agent of Shell.
*367 Finally, Article 12 requires that all notices given under the lease be in writing.
Insofar as the 1969 dealer agreement is concerned it extends to Marinello no rights or privileges except to the extent that Shell agrees to sell him "Shell gasoline and products" (subject to certain limitations) and a license to use Shell's trademarks, brand names and identifications to advertise at the station. The agreement otherwise is a reservation to Shell of complete discretion with respect to the manner in which business will be transacted between the two parties.
The new lease and dealer agreement went into effect on June 1, 1969, for a term expiring on May 31, 1972. During this interval Marinello had two new dealer representatives, Joseph Hogan from July 1969 to February 1971, and Wade Ogg who took over the territory from Hogan and still has it. On February 2, 1972 Marinello met with Rigg and Ogg at the Shell district office in Clifton. He was informed by Rigg that Shell would not renew his lease. A discussion ensued, following which Marinello met with the District Manager, J.E. Gerlock, who confirmed Shell's decision not to renew the lease. Under date of April 14, 1972 Shell sent formal written notice to the above effect to Marinello and demanded that he surrender the premises on May 31, 1972. On June 1 representatives of Shell went to the Marinello station but he refused to quit the premises.
Shell instituted suit in the county district court pursuant to N.J.S.A. 2A:18-53 for possession of the premises. Marinello filed an answer in that proceeding asserting various legal and equitable defenses. He also commenced an action in the Superior Court, Chancery Division, seeking, among other things, injunctive relief against his eviction by Shell. By order of the assignment judge the county district court dispossess action was transferred to the Superior Court for trial. See N.J.S.A. 2A:18-60; Morrocco v. Felton, 112 N.J. Super. 226 (Law Div. 1970).
At the commencement of the trial and on the court's own motion the statutory dispossess and the Chancery Division *368 actions were consolidated for the purposes of trial as to all issues except damages. As the result of rulings made by the court during the trial as well as concessions of counsel the following issues remain for decision based upon the pleadings of the parties, as amended:
(1) Does the Franchise Practices Act, N.J.S.A. 56:10-1 et seq., apply to the lease and dealer agreement in this action?
(2) Is there any limitation on Shell's statutory and contractual right to possession of the premises by reason of the relationship that existed between the parties as reflected in the written agreements and the course of dealings between them?
(3) Assuming Shell's right to possession is not unrestricted, has the defendant, Marinello, substantially performed his obligations under the terms of the lease and dealer agreement?
(4) Is Shell barred from seeking relief in this proceeding by reason of its unclean hands?

I
The Franchise Practices Act, N.J.S.A. 56:10-1 et seq. (L. 1971, c. 356) was approved and became effective on December 21, 1971. As stated in section 1, the act seeks to define the relationship and responsibilities between parties to franchise arrangements. Under section 3 a franchise is defined as any:
* * * written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.
The principal regulatory feature of the act is found in section 5 which prohibits a franchisor ("a person who grants a franchise to another person") from terminating, canceling or failing to renew a franchise "without good cause." Section *369 7 further prohibits a franchisor from imposing "unreasonable standards of performance upon a franchisee" (subsection (e)) or attempting to circumvent the provisions of the act by inserting "any term or condition in any lease or other agreement ancillary or collateral to a franchise" (subsection (f)).
There can be no question but that the franchise arrangements set forth in the dealer and lease agreements in this case were intended by the Legislature to be subject to the act, and if otherwise applicable the act limits Shell from terminating its lease with Marinello except for "good cause" and upon at least 60 days' written notice setting forth "all the reasons" which constitute good cause for such action. The act by its own terms applies to a lease agreement which is part of the franchise  and that is clearly the case in the relationship between an oil company and its dealer-lessee  or which is ancillary to the franchise arrangement.
The argument here is focused upon the provisions of section 8 of the act which states:
This act shall not apply to a franchise granted prior to the effective date of this act, provided, however, that a renewal of a franchise or an amendment to an existing franchise shall not be excluded from the application of this act.
It is urged by defendant that while the franchise agreements themselves are not subject to the act since they were in existence prior to its effective date, nevertheless the failure to renew the franchise agreements  since it involved conduct subsequent to the act's effective date  is regulated by the act. In support of this interpretation reference is made to the provision of section 8 dealing with a renewal of an existing franchise, and it is said that this language comprehends the "failure to renew" as well as a renewed franchise.
In construing the legislative intent it is axiomatic that courts must avoid a construction of a statute which will render any part of it inoperative. See Hoffman v. Hock, 8 *370 N.J. 397, 406 (1952). Were the defendant's reasoning to prevail the effect would be to subject all franchises in existence prior to December 21, 1971 to at least that provision of the act which prohibits an arbitrary refusal to renew and thus render the unambiguous language of the first half of section 8 completely inoperative.
The legislative history of this act conclusively demonstrates that all pre-existing franchises were intended to be exempted from many of its regulatory features. As originally passed by the Legislature, Assembly Bill 2063 provided that it would not apply to a franchise for a definite period of time granted prior to its effective date. The bill in this form was conditionally vetoed by Governor Cahill, and in his message returning the bill he stated:
Section 9 of the bill provides that the act shall not apply to a franchise for a definite period of time granted prior to its effective date. As drafted, this language infers that the act would apply to franchises for an "indefinite period of time" granted prior to the effective date. If such were the case, it would have the effect of impairing the obligation of existing contracts. This is prohibited by both the United States and New Jersey Constitution. It is my recommendation that this language be amended so that the act shall not apply to any existing franchises. It is to be noted, however, that any amendment or renewal of an existing franchise after the effective date of this act would come within the provisions of the act.
The recommendations of Governor Cahill as quoted above were incorporated into the act as finally passed. In view of this history the construction of the act urged by defendant is clearly untenable.
Finally, on this phase of the case defendant contends that factually there was an amendment of the franchise agreements after December 21, 1971, so as to invoke the proviso of section 8. It is said that the hours-of-operation clause was amended by oral agreement during January or February 1972, and that the dealer agreement was amended by reason of defendant's giving Shell a substantial order for TBA in April of 1972. While more will be said of these matters later, it is sufficient to note here that in neither *371 instance did the conduct involved and relied upon by defendant constitute an amendment to either the lease or the dealer agreement as a matter of fact or in law.

II
We turn then to the question whether Shell may unilaterally terminate the agreements and take possession of the leased premises at the end of the demised term. Shell's position in this respect is clear: relying upon the provisions of the dispossess statute, N.J.S.A. 2A:18-53, and Article 9 of the lease, it says that it has the "absolute" right to possession both as a matter of law and contractual agreement. A host of decisions from various jurisdictions throughout the country  described as the overwhelming weight of authority  is cited in support of this proposition. Two New Jersey cases are cited and said to be in accord: Miller-Becker Co. v. P. Ballantine & Sons, Inc., 9 N.J. Super. 78 (App. Div. 1950), and Phoenix Hardware Co. v. Paragon Paint and Varnish Corp., 122 N.J. Eq. 140 (E. & A. 1937). Neither case is in point. The authorities cited from other jurisdictions generally have upheld a contractual right to terminate a franchise agreement in accordance with its terms. See, e.g., Parks v. Baldwin Piano & Organ Co., 386 F.2d 828 (2 Cir.1967); Shain v. Washington National Insurance Co., 308 F.2d 611 (8 Cir.1962); All States Service Station v. Standard Oil Co., 73 App. D.C. 342, 120 F.2d 714 (1941); but see Oldfield v. Chevrolet Motor Co., 198 Iowa 20, 199 N.W. 161 (Sup. Ct. 1924); Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5 Cir.1965).
The fact that Shell here asserts its rights as a landlord to terminate a lease is not the end of the inquiry. It is now recognized that a lease is simply a species of contract which happens to concern real estate, and we must determine under principles of contract law the construction of the document in question in a manner consistent with the true intent and purpose *372 and the reasonable expectations of the parties as suggested not only by the contents of the instrument but the whole of the relationship that existed between them. Marini v. Ireland, 56 N.J. 130, 141-145 (1970); cf. Harr v. Allstate Insurance Co., 54 N.J. 287, 303-304 (1969).
Furthermore, it should be apparent that we are not dealing here with a traditional landlord-tenant relationship but with what is essentially a form of commercial venture  a franchise  for the marketing of Shell's products, in which both parties have a common interest and profit from the activities of the other. Shell's interest in these premises is obviously more than the interest of a landlord, and Marinello's interest transcends that of a tenant  his investment and very livelihood depend on his remaining within the good graces of Shell's local employees who, as the record here demonstrates, exercise final and absolute authority over his tenure as a Shell dealer.
The question here is whether or not, considering the history of the relationshp between the parties, their respective bargaining positions in their dealings, their course of conduct over an extended period of time, and what may be characterized as the reasonable expectations of the parties in this situation, Shell can, without cause or justification, terminate the relationship and evict defendant from this station.
The federal courts, in a different context, have addressed themselves to and described the relationship that exists between any major oil company and its dealers. Atlantic Refining Co. v. F.T.C., 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1962), reh. den. 382 U.S. 873, 86 S.Ct. 18, 15 L.Ed.2d 114 (1962), as well as between Shell and its dealers, Shell Oil Co. v. F.T.C., 360 F.2d 470 (5 Cir.1966). In both instances the respective courts were concerned with the anti-competitive effects of arrangements between major oil companies and manufacturers of TBA by reason of the inherent coercive power which the oil companies have over their dealer purchases of TBA. The language of Judge Wisdom in the Shell Oil case is both vivid and illuminating:
*373 The relationship of a major oil company to its service station dealer goes beyond the bigness-littleness antithesis that exists in innumerable contract negotiations and in the operations of a modern, large business. The inherent leverage a major oil company has over its dealers results from the market structure of the industry and the special dependence on the company of the service station dealer (who is usually also a lessee). * * * A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord. When he hears that Shell will benefit from his patronage of sponsored TBA outlets, the velvet glove of request has within it the mailed fist of command. His interest in catering to Shell's sponsorship of certain TBA will be especially strong when the time for lease renewal approaches (once a year) or when a change in rental or commission appears in sight. The run of the mill service station dealer is a man of limited means who has, for him, a sizeable investment in his station. Much of the value of that investment is in goodwill attached to the gasoline he sells, the TBA he stocks, and the location of the station where he sells these products. While it is true that it is expensive for Shell to switch dealers, it is far more expensive, in relative terms, for a dealer to lose his station. [360 F.2d at 487]
The same characteristics of the company-dealer relationship described by Judge Wisdom are present here. The course of dealings between these parties began at the invitation of Shell. Its employees represented to Marinello that if he made the necessary investment and devoted his labor and skill to "build up" the station he would have a "future" with Shell. Over a period of 13 years, by reason of his efforts as well as those of Shell, the volume of Shell gasoline pumped at the station increased from under 38,000 gallons a month to more than 78,000 gallons. Throughout this time, with the exception of 1969, Shell tendered to him leases and dealer agreements which ran for one-year terms, always on forms prepared by Shell, and effectively reserving to Shell the "mailed fist of command" within the "velvet glove." Year by year the only real asset Marinello had was the increasing value of the good will which he through his labor, and Shell through its marketing programs, developed at this location. Surely no person would make the kind of investment in money, time and effort as did Marinello without the reasonable expectation that if he substantially performed his obligations *374 to Shell, the latter would in turn continue to renew his lease and dealership. He was, by virtue of Shell's dominant position in their relationship and the legal structure of the agreements whose terms he could not vary, compelled to rely upon Shell's good faith in living up to these expectations.
Indeed, as testified to by Shell's own witnesses at the trial, it is now and has been Shell's policy not to terminate a lessee-dealer except for good cause. All of the Shell employees who testified on this subject affirmed that representations of the kind made to Marinello are made as a matter of course to prospective dealers, and that Shell never cancels a lease without justification. Thus, Shell's own reasonable expectations with respect to the continuance of their relationship coincided with those of Marinello. However, Shell at no time incorporated such a commitment in any written instrument tendered to Marinello, or to any other dealer. While it is true that the right of termination of the relationship is extended under the agreements to the dealer-lessee as well as Shell, the practical realities of their respective positions renders such mutuality an empty gesture: where a dealer has expended years of effort to develop his business at a specific location it is small comfort to him to be told when Shell terminates the relationship that he had always enjoyed the same right.
Courts have traditionally and at an increasing tempo, and whether in the exercise of their legal or equitable powers, sought to redress the imbalance when a party who occupies the dominant position in an agreement invokes the aid of the judicial process to perfect its advantage. See United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942), where Mr. Justice Frankfurter said:
But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other? [315 U.S. at 326, 62 S.Ct. at 599, 86 L.Ed. at 876]
*375 The subject matter of the agreements before the court is one in which the public interest has been legislatively declared to be vitally affected. N.J.S.A. 56:10-2. The fact that the Legislature has acted to provide a remedy as in the case of the Franchise Practices Act, supra, does not mean that the judicial branch is limited to the boundary lines of the legislative expression in fashioning or denying remedies in a particular case. Legislation of necessity concerns itself with regulations of a general nature which look to the future; it cannot deal with the specific case of Shell Oil Co. v. Frank Marinello. The latter is peculiarly the function of the courts: to examine the facts and circumstances of the particular case and accomplish justice and fair play as between the parties who are before the court. In the performance of this function legislative judgments may be and frequently are highly persuasive in pointing out to the courts the direction in which they ought to go in the individual case in the pursuit of this judicial goal. The Franchise Practices Act, as far as it goes, strongly suggests that the relationships projected by such agreements, whether in existence prior to or created after its effective date, require special attention and should be the subject of close judicial scrutiny and supervision. Indeed, the Legislature has by this act written into every franchise agreement or renewal an "implied" covenant which is both reasonable and necessary in view of the history and the legal structure of the relationship between the parties to this controversy.
In Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960), the Supreme Court held that an automobile manufacturer's disclaimer of any express or implied warranties was void as against public policy (at 404), and it imposed upon the manufacturer and in favor of the consumer an implied warranty of merchantability (at 384). All of the considerations which prompted the court to reach these holdings are present here: the absence of free bargaining and the economic imbalance between parties; the use of *376 the standard form agreement which has been imposed upon the market place by the party who has the greater bargaining position; and above all, the harm to the public interest in the literal enforcement of the contract as mandated by one of the parties. The court said:
A contract, or a particular provision therein, valid in one era may be wholly opposed to the public policy of another. * * * Courts keep in mind the principle that the best interests of society demand that persons should not be unnecessarily restricted in their freedom to contract. But they do not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way. * * * [at 403-404]
See also Marini v. Ireland, 56 N.J. 130, 143 (1970); Reste Realty Corp. v. Cooper, 53 N.J. 444, 451-453 (1969); Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 843 (2 Cir.1952), cert. den. 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952).
The reasoning of the court in the Henningsen case is equally applicable to the facts at hand, and it is therefore held that as between these parties the lease and the dealer agreement are subject to the implied covenant that Shell would renew the agreements so long as defendant substantially performed his obligations to Shell.
Of course, when a court construes an agreement so as to read into it a commitment not in fact expressed by the parties, or, as in Henningsen, contrary to the terms of the agreement, the net effect is to reform the instrument in a manner consistent with the intended but unexpressed purposes of the parties, or in accordance with the requirements of public policy. In the instant case both justifications for the granting of reformation exist, and that remedy is more appropriate to guide the future relationship of the parties. See Drake v. Boonton, 106 N.J. Super. 79, 86 (Law Div. 1969). As noted by Justice Hall in Harr v. Allstate Insurance Co., 54 N.J. 287, 300-306 (1969), courts have evolved various doctrines, equitable estoppel among them, to *377 avoid the practical limitations on the availability of reformation by reason of the rigid requirements imposed for that remedy. Such doctrines are less restrictive verbal formulae applied to comparable facts and are precisely equivalent in their consequences to the remedy of reformation. A more sensible approach, particularly where as here the proofs are clear and convincing, is to reform the contract itself. See Portella v. Sonnenberg, 74 N.J. Super. 354, 358-359 (App. Div. 1962); Maryland Casualty Co. v. Kramel, 80 So.2d 897 (La. Ct. App. 1955); Mike Occhiato Mercantile Co. v. Allemannia Fire Ins. Co., 98 F. Supp. 888 (D.C. Colo. 1951); cf. Brodzinski v. Pullek, 70 N.J. Super. 63 (Ch. Div. 1961), aff'd 75 N.J. Super. 40 (App. Div. 1962).
Reformation of the agreements should extend to and include not only a restriction upon Shell's right of termination but also those provisions of the lease which were historically subject to change upon renewal. As testified here by Shell's witnesses, no changes in the terms set forth in Shell lease forms were ever made upon renewal of a dealer's lease except as to rent and hours of operation. As to the former, Shell does not negotiate rents with its dealers except in extraordinary circumstances; the rents are determined in accordance with a schedule prepared by the district manager which applies to all Shell stations similarly situated. The rent clause of the lease will therefore be reformed so as to fix future rents at the then prevailing rental schedule fixed by Shell for stations similar to that operated by defendant.
As to hours of operation, Shell should have the right to direct a change in hours in any lease renewal, including a demand for 24-hour operation of the station, provided that the demand is consistent with Shell leases granted to other dealers similarly situated and reflects the consistent and non-discriminatory application of Shell's policy in the Newark district to Marinello's lease.
While the granting of reformation of the lease as described above does constitute an "infringement" of Shell's exclusive dominion over its property, it is nevertheless consistent with *378 the franchising and terms-of-rental policies which Shell claims that it has in effect at the present time, and in the opinion of the court is the minimum reformation required to accomplish fair play as between the parties without creating economic hardship for either.

III
Did defendant substantially perform his obligations under the terms of the lease and the dealer agreement? Much of the trial time was consumed by testimony directed to that question. A fair starting point for such an inquiry is a review of the agreements to ascertain what, if any, standards of performance were sought by Shell. In this connection it should be noted that at no time did Shell supplement the agreements so as to indicate in writing the quality of performance it expected of this dealer as its tenant-franchisee.
The dealer agreement contains no performance requirements except to obligate the dealer to honor Shell credit cards and to forbid the use of any Shell identification in connection with the sale of products other than those of Shell. It is not claimed that either condition was violated by defendant.
The lease imposes several obligations upon Marinello which may be summarized in the main as follows: (1) to pay rent; (2) to furnish a security deposit; (3) to use the premises only for the operation of a service station; (4) to keep the station open 24 hours a day subject to requirements of local law and, if such hours are prohibited, then from 6 A.M. to 12 P.M.; (5) to maintain the station in good condition and repair, and to keep it neat, clean and orderly; (6) to indemnify Shell against any loss or liability arising out of the operation of the station. No claim was made by Shell of a violation of the above except as to (4), the hours of operation, and (5), the cleanliness or appearance provisions.
*379 As to hours of operation there is no substantial dispute that except for brief periods in 1970 and early 1972, Marinello did not operate the station on a 24-hour basis. Reading Articles 3 and 5 of the lease together it is not clear whether there was an absolute obligation on Marinello's part to maintain the hours specified or only an increase in his per gallon rent if he failed to do so. Marinello's understanding of these provisions was that he was asked to try a 24-hour operation to see if it would be successful, that it was not; that complaints were received from neighbors as well as borough officials about his hours, and that his dealer representative told him to go back to his old hours.
At the end of January and twice in March 1970 Shell did send letters to Marinello informing him that he was in violation of this provision of the lease. Shell acknowledges that after these letters were sent, the Newark district office received complaints from borough officials, as well as at least one neighbor, about a 24-hour operation at this location, and that Shell no longer insisted upon adherence to this provision of the lease, but permitted Marinello to revert to the hours that he had maintained under the prior lease.[2]
I therefore find that Marinello substantially performed his obligations with respect to hours of operation under the lease as interpreted and understood by both Marinello and Shell.
*380 The remaining claim of nonperformance in its narrow sense is addressed to an alleged violation of the cleanliness clause of the lease. Shell's witnesses testified that the overall appearance of as well as specific conditions observed at defendant's premises were not in keeping with the service station image which Shell hoped to project for its stations.[3] Hogan and Ogg, the two most recent dealer representatives assigned to Marinello, testified that on different occasions they called defendant's attention to specific matters such as dirty rest rooms, dirty office windows, lack of sufficient inventory, uncut weeds along a fence at the side of the station, the presence of unlicensed vehicles on the property, an accumulation of discarded parts and refuse at the rear of the station, and his failure to pursue good merchandising practices. It was admitted by these witnesses that they encountered the same or substantially similar deficiencies at other Shell stations and that the presence of working dirt at a service station, the maintenance of rest rooms, and the disposal of discarded parts and station refuse are "universal" problems.
Defendant presented 11 witnesses  customers, suppliers, and even a competitor  who testified, in summary, that the station operated by Marinello was exceptionally clean and well-kept, and that they received courteous and satisfactory service. While it may be said that these witnesses did not view defendant's station with the discerning eye of a professional, the same cannot be said of the testimony *381 of Jerry Ferrara, who is the executive director of the New Jersey Retail Gasoline Dealers' Association. Ferrara has been active in the retail gasoline business as an operator and station owner for 23 years, and has held his present position with the NJRGDA since 1968. He testified that on one occasion prior to the termination of the defendant's lease a competing gasoline company had made a study of Marinello's station as an example of how a good service station should be operated. Ferrara had made personal observations of defendant's station over a period of time, had rated the station on February 3, 1972, and had observed it once a week since that date. He expressed the opinion that Marinello's station was one of the best operated stations in the area. His opinion was corroborated by the testimony of Joseph Tropia, one of Marinello's competitors, who described defendant's station as one of the cleanest he had ever seen.
The resolution of the conflict in the testimony on this aspect of the case is not difficult. I find that the Shell witnesses, in particular Ogg, were less than candid on several aspects of the case, and I reject their testimony as being not credible. Much reliance was placed by Shell on Ogg's work sheets on which he purported to rate Marinello's station during his visits. With but one exception, on every occasion he rated the general appearance of the Marinello station as deficient. He stated that this rating was based upon one or more deficiencies noted in several enumerated categories concerning exterior conditions which were listed on his work sheets. On at least four occasions, however, his work sheets contain no reference to a deficiency in any specific category.
Ogg's work sheets for the S & S station in Garfield were produced and disclosed that over the same period of time he did not rate that station, which he and other Shell witnesses described as one of their best-maintained stations, as deficient in general appearance on any occasion despite the fact that on almost every visit he noted a deficiency in some specific category on his work sheets. Moreover, Ogg's complaints *382 about the conditions at this station closely paralleled those he noted at Marinello's. On certain occasions the sales room as dirty, the rest rooms were deficient, the windows were dirty, the driveways were cluttered, cars were parked at the station, the pumps needed painting, the attendants were not in uniform, or the station lacked adequate manpower.
On the other hand, Ogg described the Shell station located on the westbound side of Route 46 as "dirty" in comparison to Marinello's. However, his work sheets for this station disclose that on six visits to that station in 1972 he never noted any deficiency in its general appearance. It is obvious that Ogg, upon whose recommendation the decision to terminate Marinello's lease was allegedly made, based his opinions and his recommendations on factors other than the operational conditions at Marinello's station.
Rigg testified that he also had observed the defendant's station on a number of occasions, and that he had concluded the defendant was in violation of the cleanliness clause of the lease long before February 2, 1972 when he met with Marinello and told him his lease would not be renewed. However, at no time did he give written notice to the defendant of any such violation, as he did on three separate occasions with respect to hours-of-operation clause. Under the terms of the lease, had Marinello been in violation of any provision of the lease (other than the payment of rent), Shell was required to give him written notice of such violation, in which case he would have 15 days to correct the violation. The fact that no such notice was ever given under this lease compels the inference that no violation in fact existed.
I conclude, therefore, that defendant substantially performed his obligations under Article 7 of the lease.
From Shell's standpoint, however, it is concerned with a performance standard of greater significance than the defendant's housekeeping practices. While this standard is not part of any written obligation assumed by defendant, it *383 is nevertheless implicit in Shell's relationship with Marinello as well as any of its dealers: Shell seeks to realize the maximum profit potential for itself at this location. This of necessity translates itself into achieving (1) the maximum gasoline sales volume under existing competitive conditions, and (2) the maximum sales of Shell TBA. The defendant's asserted failure with respect to the former was cited by Shell's witnesses as the primary reason for termination of his lease, whereas the latter was claimed never to have entered into the thought processes of any Shell employee who played a part in the ultimate decision. How the two can be separated when a business judgment such as that involved here is being made defies comprehension. The apparent line of demarcation could only be that the one objective, increasing gasoline volume, is a legitimate business goal, whereas the other may involve the commission of a crime to the extent that Shell's policy is to consider a dealer's past performance record of TBA purchases in deciding whether to renew his lease. See N.J.S.A. 56:6-22(b).
Ignoring for the moment the TBA aspect of the case, the question then is whether on the evidence presented here defendant did not realize a reasonable level of performance with respect to gasoline sales at this location under existing competitive conditions. The location involved is unquestionably a prime location for a gasoline service station, but at the same time it is primarily a neighborhood station dependent upon local residential trade and with but limited exposure to commuter traffic. During the three years of the last lease term defendant's monthly average of gas purchases from Shell was in excess of 78,000 gallons, which substantially exceeded Shell's per station average in the State, the Newark District, and in defendant's own territory where he ranked fourth out of 20 dealers in average purchases over the three-year period.
The evidence also discloses that during the calendar years 1969 through 1971 the average monthly gallonage pumped by defendant remained static: 78,500 gallons per month in *384 1969, 78,800 in 1970, and 78,100 in 1971. Whether these figures indicate that he has achieved the maximum potential at this location, which was the opinion of Ferrara, or whether, in the words of Gerlock, no Shell dealer ever achieves his full potential at any location, the fact is that defendant's record was not materially worse nor better than other Shell dealers in his territory.
His record in comparison to those of other dealers in his territory is the most reasonable yardstick by which to measure his performance. In calendar year 1969 defendant increased his gallonage from an average of 70,400 monthly in calendar 1968 to 78,500, or 11%, which was acknowledged to be a satisfactory increase. In 1970 his average monthly rate was 78,800 gallons, an insignificant increase. During that year in his territory 16 dealers  including defendant  increased their gallonage, while four decreased. In 1971 defendant's average was 78,100, an insignificant decrease. During that year eight other Shell dealers in his territory declined in average monthly volume, some substantially, while 11 dealers increased their gallonage. Of the two best stations in the territory one increased its volume in 1971, while the other declined more than did Marinello. There is thus no discernible pattern to the Shell dealers' sales records during the 1969-1971 period from which one could conclude that defendant failed to perform in a satisfactory manner.
There is, however, an important market factor which the Shell witnesses acknowledge could have had a substantial impact upon his performance in 1971 and which I find did adversely affect defendant's sales in that year. In February 1971 a gasoline price war erupted on Route 46, which is located 1 1/2 miles from defendant's station, and the price war spread into his immediate territory. Throughout the year 1971 defendant did not lower his prices, and the fact that he was able to maintain his sales volume for the year at about the prior year's level was more than could *385 reasonably be expected of him under the competitive conditions with which he was confronted in that year. The statistics for the first five months of 1972 are comparable.
Those in the Shell organization who were responsible for the ultimate decision to terminate defendant's lease admittedly did not take into account the effects of the price war on defendant's performance record. Nor did they have before them any "hard" data or information to reach a rational business judgment as to defendant's performance record on gasoline sales over the period of this lease. That record, I find, presented no just cause for Shell to terminate Marinello's lease and franchise.

IV
The remaining issues in the case concern the defense of unclean hands asserted by defendant as a bar to the granting of relief sought by Shell. While numerous allegations of unconscionable conduct on the part of Shell were made by defendant, in the main the defense of unclean hands involves two specific areas of Shell's marketing practices as they affected Marinello: (1) the allegation that Shell unlawfully refused to renew Marinello's lease because of his failure to purchase a sufficient volume of TBA from Shell, and (2) the allegation that Shell unlawfully discriminated against Marinello in the pricing of gasoline sold to him.
The marketing of gasoline is at least a partially regulated industry in this State, see N.J.S.A. 56:6-1 et seq., and is likewise subject to federal anti-competitive legislation such as the Sherman Act, 15 U.S.C.A. § 1; see Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5 Cir.1965); the Clayton Act, 15 U.S.C.A. § 12 et seq.; the Robinson-Patman Act, 15 U.S.C.A. § 13, and the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1). Retail gasoline dealers are prohibited from granting price rebates from the posted prices to their customers, see N.J.S.A. 56:6-2(e); and distributors such as Shell may not grant *386 gas price rebates or allowances or discriminate, either directly or indirectly, in their tank wagon gas prices as between different retail dealers "except to meet competition." See N.J.S.A. 56:6-22(a)(c); 15 U.S.C.A. § 13(a). The distributor cannot compel its dealer to sell at prices fixed by the distributor, see Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), reh. den. 377 U.S. 949, 84 S.Ct. 1349, 12 L.Ed.2d 313 (1964); Broussard v. Socony Mobil Oil Co., supra, 350 F.2d at 349, although it can and does suggest a retail price which the dealer may accept or reject as he chooses. Nor can a distributor enter into leases or contracts tying in the sale of its gasoline to other products or commodities such as TBA where the effect is to restrain competition. See N.J.S.A. 56:6-22(b); 15 U.S.C.A. § 14; cf. Shell Oil Company v. F T C, 360 F.2d 470 (5 Cir.1966); Atlantic Refining Co. v. F T C, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), reh. den. 382 U.S. 873, 86 S.Ct. 18, 15 L.Ed.2d 114 (1965); Broussard v. Socony Mobil Oil Co., supra.
With respect to the TBA aspect of the case, defendant's proofs on this issue may be summarized as follows: Shell's dealer representatives since at least 1969 solicited orders for TBA from him at the same time they were "rating" the manner in which he operated his station; they would urge him to order TBA from Shell and would mention the fact that they had sales "quotas" to meet; his purchases of Shell TBA were well below the average of other Shell dealers in his area, and Rigg mentioned this as one reason for the termination of his lease at their February 2, 1972 meeting. Finally, defendant says that he met Rigg at a sales promotion meeting in late February 1972 and he asked Rigg if anything could be done to get Shell to change its mind about the termination of his lease. Rigg was said to have replied, "You know what they want. Give it to them and everything will be all right." Defendant says he understood Rigg to mean only one thing: buy more TBA from Shell and your lease will be renewed.
*387 Rigg denied that he ever referred to defendant's TBA purchases in any conversation with him, and as to the February 2 meeting his testimony was corroborated by that of Ogg who was also present at that meeting. On the other hand, the Shell witnesses acknowledged that a function of the dealer representatives was to solicit TBA orders from dealers during their visits at the same time they were rating the dealers' operations, and that proportionately Marinello's purchases of TBA from Shell were among the lowest of any dealer in his territory. And while they denied that the representatives had sales "quotas" for TBA, it was acknowledged that the representatives did have TBA sales "goals" based upon the prior year's sales and that cash prizes or gifts were awarded to representatives who met their sales "goals" for each quarter. Wall charts were maintained at the district office showing each representatives TBA sales record, and his record played at least some part in the promotion process not only for the dealer representative but for his immediate superior, the sales supervisor for the district.
Were it necesary to do so, I would resolve the issue of credibility as to the alleged oral statements of Rigg in favor of Marinello. I do not find it necessary, however, for the reason that whether such statements were made is irrelevant. The essential fact is that Shell has elected to expand its marketing activities to include the sale of TBA to its dealers, and it has created an organizational structure to carry out that objective which is inherently coercive and which inevitably tends to tie in the sale of its gasoline to its dealers to their purchase of Shell TBA. In Shell Oil Co. v. F T C, supra, the Court of Appeals was reviewing an order of the Federal Trade Commission which prohibited agreements between Shell and a third party  a major tire manufacturer  under the terms of which Shell received a commission on the manufacturer's sale of TBA to Shell dealers. The Commission's order was affirmed and such agreements were declared to be in restraint of trade under *388 the Federal Trade Commission Act, 15 U.S.C.A. § 45(a) (1), because the court concluded that by reason of the economic life-and-death power Shell had over its dealers, the system is inherently coercive and innately anticompetitive in its effect. 360 F.2d at 487. The logic and pragmatism of the court's analysis are unassailable, and apply with even greater force to a marketing system whereby Shell sells its own branded TBA to its dealers.
The anti-competitive impact of this system is further accentuated by Shell's marketing organization. The very individuals who initiate the life-or-death decision for Shell dealers are also the same individuals who are most directly and immediately concerned with the sale of Shell TBA to its dealers. The facts of this case demonstrate that the linking of these two functions inevitably must produce decisions on lease renewals which are at least in part influenced by an individual dealer's TBA purchase record, and I am satisfied that such was the case here. Attributing to the Shell executives responsible for the formulation of its marketing policies a reasonable measure of intelligence and sophistication in these matters, it is obvious that this is the desired and intended consequence. It is also a violation of the statutory law of New Jersey and of the United States in that the necessary and inevitable result is to restrain trade and substantially lessen competition in the distribution and sale of TBA.
The remaining factual issue is whether Shell unlawfully discriminated in the tank wagon gas prices charged Marinello. Here again the economic background and marketing structure of the gasoline industry, as well as the evidence in this record, must be considered in resolving the issue. To begin with it is obvious that the major oil companies are interested in maintaining price stability for their products. Except in times of severe over-supply, excess refining capacity or in order to challenge specific local situations, price competition is not a desirable way of economic life for them. As testified to by a responsible Shell official in this proceeding, *389 Shell does not initiate price competition, but it does react defensively and does reduce its prices to dealers where such competition affects local markets. The mechanism by which it does so is called the "competitive price assistance program" (CPA), and in summary form it operates in this manner: in each district geographic trade areas are established which serve as the basis for granting CPA when by reason of other suppliers' lowering prices Shell dealers are adversely affected. The trade area in theory includes "all service stations [which] have exposure to and compete with one another * * * for the same customers under normal contitions,"[4] and trade areas may include more than one Shell station and be of varying sizes. Trade areas are delineated on a map maintained by the regional and district offices and changes may be made from time to time to reflect changing competitive conditions or "when experience establishes an error in judgment in setting up the original trade areas."
The granting of CPA is initiated by the dealer representatives who conduct periodic surveys to ascertain competitive price conditions in their territories. If price competition begins in his territory, the representative may recommend that CPA be given to the Shell dealer or dealers in the trade area or areas where it exists. And:
If Shell decides to assist one dealer, it is essential that all other Shell dealers in the affected trade area be given assistance regardless of their selling prices; Shell dealers are free to post a retail price of their own choosing.
*390 Where Shell dealers in adjacent trade areas are actually affected by price competition elesewhere or such effects may be anticipated, CPA may also be granted to them under a process desicribed as "feathering out" CPA from "the center of price disturbance." Shell's policy is to grant a wholesale price reduction equal to 60% of what it expects or suggests the reduction in retail price to be. For example, if Shell suggests that the dealer in the affected area reduce his price by 3¢ per gallon, it grants him CPA of 1.8¢ per gallon. In other words, the tank wagon price to that dealer is reduced by 1.8¢ per gallon for each gallon delivered so long as CPA is extended to him.
[The Court reviewed the evidence and found that Shell had discriminated against Marinello in tank wagon gasoline prices charged him during 1971.]
Having concluded that Shell was guilty of unfair and unlawful trade practices in its dealings with Marinello the question remains whether such conduct is sufficient to compel the court to deny to Shell the right to evict its tenant from its property after his lease expired. In the context of the facts of this case the answer is straight-forward and obvious: as it concerned Marinello, Shell's conduct was not only unclean but permeated the whole of their relationship, of which the lease was but one part. To grant to Shell the right to dispossess Marinello and commit him to seeking damage relief from Shell is not a realistic or an equitable resolution of the issue as between them. Cf. Broussard v. Socony Mobil Oil Co., supra; Simpson v. Union Oil Co., supra. Like any suitor against whom the defense of unclean hands may be invoked, judicial relief should be denied to Shell which will effectively redress the wrongs it has committed.
*391 Moreover, there is an interest beyond that of the immediate parties which must be recognized in this otherwise private controversy. In adopting the Unfair Motor Fuels Practices Act, N.J.S.A. 56:6-19 et seq., the New Jersey Legislature declared that the very practices engaged in by Shell must be prohibited because they constitute
(a) * * * unfair methods of competition in the marketing of motor fuels; * * * [and] have produced waste harmful to the public and impaired the sale and distribution of motor fuel * * * thereby affecting the general economic welfare of the people of this State. * * *.
(c) The distribution and sale of motor fuels within this State is hereby declared to be affected with a public interest. * * * [N.J.S.A. 56:6-19]
A legislative declaration couched in such strong terms ought not to be ignored by the judiciary, and there is precedent to support the proposition that relief should be denied under the unclean hands doctrine where plaintiff's conduct offends not only the private dealings of the parties to the litigation, but the public interest as well. Cf. Warrender v. Warrender, 79 N.J. Super. 114, 121 (App. Div. 1963), aff'd 42 N.J. 287 (1964). The doctrine of unclean hands has received its best modern expression in Medical Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177 (App. Div. 1951), wherein Justice (then Judge) Jacobs said for the court:
The clean hands doctrine is an ethical concept long applied in courts of equity although not peculiar thereto. Chafee, Some Problems of Equity (1950), pp. 1, 94. In general, its requirement is not that suitors seeking relief in equity "shall have led blameless lives" (Loughran v. Loughran, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219, 1227 (1934)), but rather that they shall not have acted fraudulently or unconscionably with respect to the particular controversy in issue. Precision Instr. Mfg. Co. v. Automotive M. Mach. Co., 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381, 1386 (1945); Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922). When applicable it is invoked not out of regard for the defendant or to punish the plaintiff but upon larger considerations "that make for the advancement of right and justice." Johnson v. Yellow *392 Cab Transit Co., 321 U.S. 383, 387, 64 S.Ct. 622, 88 L.Ed. 814, 819 (1944). Cf. Casini v. Lupone, 8 N.J. Super. 362, 365 (Ch. Div. 1950); Hansen v. Local No. 373, 140 N.J. Eq. 586, 589 (Ch. 1947).
While the doctrine is firmly rooted and naturally appeals to persons of good conscience, it may well disserve the interests of justice if applied over-sensitively or as a rigid formula restraining the court's just exercise of discretion. Precision Instr. Mfg. Co. v. Automotive M. Mach. Co., supra; Chafee, supra, p. 99. Accordingly, there has been a recent wholesome tendency amongst courts to apply the doctrine flexibly in the light of the particular circumstances presented. See 60 Harv. L. Rev. 980, 981 (1947); Rasmussen v. Nielsen, 142 N.J. Eq. 657, 661 (E. & A. 1948). A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 247 (1949); Hansen v. Local No. 373, supra. [at 179]
This quoted language was cited with approval by the Supreme Court in White v. White, 16 N.J. 458, 464 (1954). See also, Paterson v. Schneider, 31 N.J. Super. 598, 605 (App. Div. 1954).
As Justice Oliphant observed in Untermann v. Untermann, 19 N.J. 507 (1955), with reference to the doctrine of unclean hands:
The rule is not an arbitrary rule and calls for the exercise of just discretion on the part of the court. White v. White, 16 N.J. 458, 464 (1954); Medical Fabrics Co. v. D.C. McLintock, 12 N.J. Super. 177, 180 (App. Div. 1951).
It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied. Facades of the problem should not be examined piecemeal. Where fraudulent conduct vitiates in important particulars the situation in respect to which judicial redress is sought, a court should not hesitate to apply the maxim. [at 518]
As the court has indicated, it finds that on the merits defendant is entitled to judgment in the Chancery Division action reforming the lease and the dealer agreement. Even if this were not the case, judgment would still have to be entered for defendant Marinello dismissing the complaint *393 in the dispossess action since plaintiff is barred from relief under the unclean hands doctrine. Cf. Vineland Shopping Center, Inc. v. DeMarco, 35 N.J. 459, 469 (1961).
An order may be submitted by the defendant in accordance with this opinion.
NOTES
[1] A comprehensive review of Shell's marketing structure and practices is set forth in Shell Oil Co. v. F.T.C., 360 F.2d 470 (5 Cir.1966).
[2] There was testimony to the effect that Marinello did not observe the 6:00 A.M. to 12:00 P.M. hours, in that he opened at 6:30 A.M. and on a few occasions the station was closed before midnight. The 6:30 A.M. opening time had been Marinello's practice for 13 years and Shell had never complained that it was a violation. As to the early closings, Marinello had explained to the dealer representative that the night man had gotten sick and closed the station early. Nothing more was said on this subject, and in any event Shell never gave Marinello written notice of a default under the lease by reason thereof.
[3] In Shell's view of the marketplace its objectives will be furthered by altering the "image" of the service station from the unkempt, greasy-floored "man's world" of the past to a tidy "ranch house" in which women as well as men will feel at home. Uniformity of appearance and cleanliness is obviously an important part of the Shell image which it hopes to project to the public. At the same time it has adopted as its motto "Service is Our Business," and Service" in this context means the performance of activities which are inherently dirty and which generate as a necessary by-product a substantial volume of discarded parts and refuse for disposal.
[4] The definition of trade areas in terms of stations in competition under "normal conditions" is anomalous. The CPA program comes into play only when conditions are abnormal, i.e., when a gas price war has started, and hence the trade areas should be drawn so as to include all stations in competition with one another when price instability exists. Thus, assuming all dealers in any given area are quoting the same price, i.e., conditions are "normal," the customer will go to the station which gives the best service, which is most convenient, or which carries the preferred brand of gasoline. When a price war breaks out, a certain percentage of the public will "price shop" and will travel farther to make its gasoline purchases. Stations which were not under "normal conditions" in competition with one another will then become competitors.