**NORTH PENN OIL & TIRE COMPANY**

**v.**

**PHILLIPS PETROLEUM COMPANY.**

**Civ. A. No. 73-797.**

United States District Court,
E. D. Pennsylvania.

May 14, 1973.

**910**

J. Lawrence Grim, Jr., Grim & Grim, Perkasie, Pa., Michael J. Izzo, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

David Grove, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court pursuant to plaintiff's motion for a preliminary injunction to prevent the defendant from terminating its supply of gasoline and other petroleum products to the plaintiff, a Phillips branded jobber. Plaintiff alleges that the termination by the defendant Phillips Petroleum Co. of plaintiff's supply of gasoline and other petroleum products would be in violation of the federal antitrust laws as well as a breach of contract. Plaintiff also alleges that the defendant should be enjoined from terminating its supply of gasoline and other petroleum products to the plaintiff on the grounds of promissory and equitable estoppel.

Plaintiff originally filed a complaint in the Court of Common Pleas of Bucks County on April 4, 1973 alleging that the defendant's proposed termination of the plaintiff's supply of gasoline and other petroleum products on April 15, 1973 would be in violation of the contractual agreements existing between plaintiff and defendant. The complaint requested, *inter alia,* that the Court enjoin the proposed termination of the plaintiff's supply of gasoline and other petroleum products. The Court of Common Pleas of Bucks County scheduled a hearing on the motion for a preliminary injunction for Friday, April 6, 1973. On April 5, 1973 this matter was removed, upon petition of the defendant, Phillips Petroleum Co., to this Court. On April 6, 1973 this Court scheduled a hearing on plaintiff's motion for a preliminary injunction for Friday, April 13, 1973. On April 12, 1973 plaintiff filed an amended complaint alleging, *inter alia,* breaches of contract and violations of the federal antitrust laws. On April 13, 1973, the parties advised the Court that the hearing on the motion for a preliminary injunction would take at least three full trial days and could not, therefore, be concluded on or before April 15, 1973, the date on which defendant's scheduled termination of plain-

tiff's supply of gasoline and other petroleum products was to take place. Accordingly, the Court, by agreement of the parties, continued the preliminary injunction hearing until April 23, 1973 and temporarily restrained the defendant from terminating plaintiff's supply of gasoline and petroleum products through April 27, 1973. On Friday, April 27, 1973 the Court, again by consent of the parties, extended the temporary restraining order through May 4, 1973.

The Court issues this Memorandum and Order denying plaintiff's motion for a preliminary injunction after hearing the testimony presented by the parties on April 23, 24, 25, 26, 27 and May 2, 1973, after a review of the proposed findings of fact and conclusions of law filed by both parties, and after considering the extensive briefs submitted by both parties.

Plaintiff, North Penn Oil and Tire Company (North Penn), a Pennsylvania corporation with its principal place of business at 135 North Ninth Street, Perkasie, Pennsylvania, is a petroleum products jobber managed and principally owned by Earl J. Gehman. The defendant, Phillips Petroleum Company, a Delaware Corporation with its principal place of business in Bartlesville, Oklahoma, is in the business of, *inter alia*, producing and purchasing crude oil which it refines into gasolines, oils, lubricants, and other petroleum products for distribution in various parts of the United States.

Since 1947 plaintiff operated as a partnership under the name of North Penn Oil Company, and, in 1951 Mr. Earl Gehman became a partner. Subsequently, the partnership was dissolved and, in 1961, the North Penn Oil & Tire Company was incorporated with Mr. Earl Gehman as its chief executive officer. (NT 30). At the date of its incorporation, North Penn Oil & Tire Company's assets consisted primarily of trucks, accounts receivable, tire inventory, miscellaneous tools and equipment and land. It owned no bulk plant storage facility

to receive liquid petroleum products but used bulk plant facilities owned by the Texaco Company. Beginning in April 1961, North Penn became a consignee of the Texaco Company ("Texaco") for the distribution of Texaco retail service station outlets and commercial customers in an area in and around Perkasie, Pennsylvania, of gasoline and other automobile related petroleum products. Because of the limited growth potential in being a consignee, in October 1961 North Penn was considering termination of its consignee relationship with Texaco to become a jobber for a major-branded gasoline and petroleum products company. At this time there was no shortage of gasoline, and there was no difficulty in obtaining supply from almost any major oil company. (NT 33, 34). In October 1961, Phillips Petroleum Company was relatively unknown in the Northeastern United States Market when Jerry Rhoads, a Phillips District Representative, called upon North Penn and initiated conversations concerning the possibility of North Penn becoming a jobber (distributor) for Phillips' gasoline, oils, lubricants, and other petroleum products in an area in and around Perkasie, Pennsylvania. (NT 35–37). At that time, Phillips was actively engaged in efforts to expand its market into the Northeastern area of the United States through a program designated by it as its "March to Maine." The objective of Phillips was to expand its operations to every state. (NT 37).

The contemplated change from consignee status to jobber status for North Penn would require considerable capital investment in the nature of purchase and construction of bulk storage facilities including tanks and warehouse. Also, considerable sales effort would be required to convince existing dealer accounts to switch to the Phillips brand because Phillips at that time was relatively unknown to dealers in the Northeast. (NT 37, 43). In the conversations with Jerry Rhoads, Earl Gehman specifically questioned Rhoads as to whether Phillips was coming into the

Northeast to stay, because Gehman specifically indicated that he never wanted to make another product change. In response to Mr. Gehman's questioning, Mr. Rhoads replied that "Phillips never had retreated from an area." (NT 37–38).

After subsequent conversations, a meeting was set up for November 29 1961 between Messrs. Rhoads, Gehman and Doug Hawkland (Rhoads' immediate superior) at the Holiday Inn in Allentown, Pennsylvania (NT 39). At this meeting, plaintiff contends an overall verbal agreement was reached among the parties as to North Penn's becoming a Phillips' jobber. Plaintiff further testified that this oral agreement contemplated that Phillips would finance on a long-term basis the construction of a bulk plant and warehouse facility, with a lease and sublease agreement terminating in 1979, and that Phillips would supply gasoline and petroleum products for an initial contract period of three years, which would be renewable on an annual basis each succeeding year, and would not be terminated except for cause until after the date of termination of the lease and sublease agreement. Mr. Gehman further testified, however, that his understanding that the jobber contract would not be terminated until after the date of the termination of the finance agreement (1979) was based upon statements by Phillips' employees that Phillips had never left a marketing area which it had once entered (NT 193, 209). The Court finds that such statements did not constitute an oral promise that Phillips would not terminate the jobber contract except for cause. Furthermore, Mr. Gehman also testified that he was aware that the Phillips employees at the November 29, 1961 meeting had no authority to bind Phillips (NT 219). Therefore, the Court finds that the Phillips employees with whom the plaintiff had his discussions were not authorized to make any such oral agreement.

On December 6, 1961, Phillips' representatives presented and North Penn executed a standard form "Jobber Sales Contract." This contract in addition to providing for purchase of minimum and maximum amounts of petroleum products contained *inter alia* the following terms and provisions:

## 2. PERIOD OF CONTRACT

This contract shall be and remain in full force and effect for the primary term of 3 years, beginning on April 16, 1962, and ending on April 15, 1965, and for successive periods of one (1) year each thereafter unless and until either party shall notify the other in writing at least ninety (90) days prior to the expiration of the primary term or any succeeding one-year period of its desire to terminate this contract, whereupon this contract shall terminate at the end of the yearly period in which the notice is given.

## 19. ENTIRETY OF AGREEMENT

This contract contains the entire agreement between the parties hereto, and there are no oral promises, agreements or warranties affecting it.

## 22. EXECUTION

This contract shall not be binding on Seller unless and until signed by the Division Manager of Seller in Seller's Baltimore, Maryland office. Commencement of performance hereunder prior to signing by Seller as herein stipulated shall in no case be construed as a waiver by Seller of this requirement. (P&D 1)

On the same date, December 6, 1961, Phillips presented and North Penn executed a standard form "Lubricating Oil and Grease Contract." This contract, in addition to providing for the purchase of minimum and maximum amounts of lubricating oils and greases, contained, *inter alia*, the following terms and provisions:

2. This contract shall be and remain in full force and effect for the primary term of 3 years beginning on April 16, 1962 and ending on April 15, 1965, and for successive periods of one (1) year each thereafter unless and

until either party notify the other in writing at least ninety (90) days prior to the expiration of the primary term or any succeeding one-year period of its desire to terminate this contract, whereupon this contract shall terminate at the end of the yearly period in which the notice is given.

11. ENTIRE AGREEMENT: This contract constitutes the entire agreement between the parties hereto and there are no oral promises, agreements or warranties affecting it.

12. EXECUTION: This contract shall not be binding on Seller unless and until signed by a duly authorized agent of the Seller in Seller's Division Office or in Seller's Bartlesville, Oklahoma Office. Commencement of performance hereunder prior to signing by Seller as herein stipulated shall in no case be construed as a waiver by Seller of this requirement. This contract terminates and supersedes as of the effective date hereof all prior lubricating oil, gear oil, gear lubricant and greases sales contracts by and between the parties hereto. (P&D 2)

By letter dated December 7, 1961, Mr. Gehman expressly conditioned the validity of the Jobber Sales Contract which he had executed upon his securing within 90 days thereafter a source of adequate financing to allow him to purchase service station equipment, certain inventories and office equipment from his supplier (Texaco) and additional funds for the financing and constructing of bulk storage and warehouse facilities (NT 203). And by letter dated January 8, 1962, Phillips advised North Penn as follows:

We are pleased to advise that Management has approved three year Branded Jobber Contracts with your company beginning April 16, 1962. This approval is based on the following:

1. We will two-party your Bulk Plant and warehouse for a sum of $40,000 for ten years.

2. We will purchase certain equipment presently installed, or to be installed, at dealer and consumer accounts, and in turn lease the equipment to you at a rental of 1% per month. You will start to repurchase this equipment from us, at our code price, as soon as your financial condition will permit.

3. You must furnish us an itemized list of the equipment by accounts and locations, showing make, model, serial number, tank sizes, etc.

Should you have any questions regarding this matter, please advise.

Thereafter, fully executed copies of the Jobber Sales Contract and the Oil and Grease Contract were returned by Phillips to North Penn.

In the period following Phillips' January 8, 1962 letter to North Penn, financing in the amount of $55,000.00 (instead of $40,000.00) was arranged by Phillips for North Penn's bulk plant and warehouse through Alma Stations, Inc. and a two-party lease-leaseback for fifteen years (instead of ten years) was also arranged. On February 26, 1962, North Penn executed a long and short form Lease Agreement of the bulk plant and warehouse premises from North Penn to Phillips. The long-form lease specifies a monthly rental of $439.77 and contains, *inter alia*, the following provisions:

\* \* \* \* \* \*

. . . said premises being situated on 8th Street, 150 feet West of Race Street, in the City of Perkasie, together with service station buildings, improvements and equipment to be erected and installed thereon by Lessor as hereinafter provided, for a term commencing on the date said service station is accepted by Lessee's engineers as completed in accordance with this agreement and the possession thereof delivered to Lessee (which date shall be evidenced by written memorandum signed by the parties), and continuing thereafter until April 1, 1979. The

leased premises are to be used for a gasoline, oil, oil products, petrochemicals, automobile tires and accessories, any other goods, wares and merchandise, and at Lessee's option may be used for the conduct of any other lawful business thereon.

It is understood and agreed that contemporaneously with the execution of this lease Phillips Petroleum Company, the Lessee herein, has subleased the above-described premises to the Lessor herein. It is further understood and agreed that in the event said sublessee or any subsequent sublessee who owns the property defaults in any of the terms and provisions of said sublease or any subsequent sublease between the parties, and as a result of said default Phillips Petroleum Company, as sublessor, cancels any such sublease, then in that event Phillips Petroleum Company, as lessee herein, shall have the right and privilege of cancelling this underlying lease, without penalty, at any time thereafter by giving lessor herein written notice not less than sixty (60) days prior to the effective date of such cancellation.

18. This instrument incorporates all of the obligations of the parties hereunder and there are no oral agreements or understandings between the parties concerning the property covered by this lease agreement.

19. This lease shall not be binding or effective upon Phillips Petroleum Company unless and until executed on its behalf by one of its Vice Presidents, the Manager of its Sales Department, its General Sales Manager, or one of its Assistant Sales Managers or Division Managers.

On February 26, 1962, North Penn executed an Agreement of Sublease of the bulk plant and warehouse premises from Phillips to North Penn, which Agreement of Sublease contains the following provisions, among others:

2. This lease shall be and remain in full force and effect for a term commencing on the date the aforesaid buildings, improvements and equipment shall be completed and installed and possession thereof delivered by Lessor to Lessee and continuing thereafter until March 31, 1979 provided that Lessor may cancel this lease on any anniversary of the date upon which the term of the lease begins by giving written notice to Lessee at least thirty (30) days prior to the anniversary date upon which the cancellation is to take effect. Either party may terminate this lease without notice on account of the breach of the terms thereof by the other. Cessation, termination or cancellation of the Lessor's estate in the above described real property and improvements shall automatically effect the termination and cancellation without any notice whatsoever of this lease, and all rights of Lessee hereunder shall immediately cease and terminate without any liability upon Lessor for such cessation or termination.

3. As rental for the premises and the property herein leased, Lessee agrees to pay to Lessor the sum of Four Hundred Thirty Nine and 77/100 Dollars ($439.77) monthly in advance at the address of Lessor shown above or elsewhere as Lessor may direct.

\*      \*      \*      \*      \*      \*

14. This lease contains the entire agreement between the parties, and there are no outstanding oral agreements, understandings or warranties.

15. This agreement shall be binding upon and shall inure to the benefit of the parties, their respective heirs, successors and assigns, but shall become binding upon Lessor only after it has been executed by its Division Manager.

Subsequent to February 26, 1962 fully executed copies of the Long Form Lease, Short Form Lease, and Agreement of Sublease were returned by Phillips to North Penn.

In February of 1962, North Penn located a site for a proposed service station in Souderton, Pa., which site was approved by representatives of Phillips. Thereafter, Phillips undertook engineering and design of the service station to be erected upon the site and arranged for North Penn to borrow $75,000 to finance the construction costs. A Lease and Lease-Back agreement were also arranged and prepared by Phillips for execution by North Penn. As part of this transaction, North Penn entered into two written agreements of sale to purchase the site in question. Phillips prepared engineering plans and specifications for the site, including the design of the service station designating the architectural style of the station. Although North Penn was in fact purchasing the station and requested a colonial style design, Phillips insisted on its standard style service station, which included a distinctive triangular canopy projecting from the station over the island and pumps.

Also in February 1962, Earl Gehman and Esther Gehman, his wife, individually, executed a written guarantee on a form supplied by Phillips under the terms of which they in their individual capacities guaranteed all the past, present and future obligations of North Penn Oil & Tire Company to Phillips.

Phillips, through the use of recognized quick-expansion marketing methods, planned to and did in fact achieve geographic market expansion into the Northeastern area of the United States by using a jobber-oriented marketing program consisting of converting existing jobbers or distributors already affiliated with other oil companies to Phillips. (NT 430). The method of geographic market expansion used by Phillips Petroleum in the Northeast market was designed to limit the capital expenditures made by Phillips and to encourage and substitute therefor the long-term capital investments by prospective Phillips' jobbers.

The Long Form Lease, Short Form Lease and Agreement of Sublease in connection with the bulk plant and warehouse have continued in effect since 1962, and will continue in effect hereafter until March 31, 1979, unless terminated prior thereto in accordance with their terms. The service station leases will continue in effect until April 1, 1984, unless terminated prior thereto in accordance with their terms.

Plaintiff contends that it was the trade custom and practice in the petroleum industry both generally and in the Northeast marketing area that jobber supply contracts were automatically renewed each year with revision of minimum and maximum amounts of gallonage requirements and that these contracts would be terminated only upon a showing of cause—that is, some mismanagement, nonpayment of bills or conduct by a jobber indicating disloyalty or other bad business practices. Plaintiff further contends that this practice was understood and customarily followed in the trade by jobbers as well as by Phillips. The Court finds insufficient credible evidence in this record to enable it to find a reasonable probability that plaintiff will succeed in proving that such a trade custom and practice existed. Plaintiff also contends that there was an agreement that the jobber sales contracts, oil and grease contracts, and mortgage financing and lease leaseback agreements of the bulk plant and warehouse facilities were interrelated and interdependent, and, that the jobber contract would not be terminated before the expiration of the long-term financing. The Court likewise finds insufficient credible evidence to enable it to find a reasonable probability that plaintiff will succeed in proving this contention. Like the Long Form Lease, Short Form Lease and Agreement of Sublease between North Penn and Phillips relating to North Penn's bulk storage and warehouse facility, the service station leases each expressly provided that it contained the entire agreement between the parties with respect to the subject matter thereof, and that there were no oral agreements or understandings with re-

spect thereto. The terms of the written contracts, agreements, leases and subleases described above between Phillips and North Penn are clear and unambiguous.

At no time did Phillips, or any officer, director or employee of Phillips, agree, orally or in writing, to amend the provisions of the Jobber Sales Contract and the Oil and Grease Contract so as to make their terms relating to duration co-extensive with the terms relating to duration of the Long Form Lease, Short Form Lease, Agreement of Sublease or the service station leases, or so as to alter or amend in any way the terms relating to duration of the Jobber Sales Contract and the Oil and Grease Contract. Furthermore, the Court finds that at no time did Phillips, or any officer, director or employee of Phillips, agree with, represent to or advise North Penn, or any officer, director or employee of North Penn, that the periods of the Jobber Sales Contract and the Oil and Grease Contract, or Phillips' obligation to supply gasoline and lubricating oils and greases to North Penn, would extend as long as the periods of the Long Form Lease, Short Form Lease, Agreement of Sublease and the service station leases.

Phillips never agreed with North Penn, nor did Phillips ever cause North Penn to understand, specifically or generally, that North Penn would not again have to change petroleum suppliers. Nothing in North Penn's supply contracts with Phillips tied North Penn to Phillips, or *vice versa*, until 1984, and nothing in those contracts made it impossible for North Penn to terminate its supply relationship with Phillips prior to 1984.

Throughout its relationship with Phillips since 1961, North Penn has always fully performed its obligations to Phillips. It has always paid its bills promptly when presented, qualifying in every instance (except two) for discount terms given by Phillips for prompt payment of bills. North Penn has never engaged in poor business practices, has always hauled and supplied only Phillips-branded gasoline and has never been criticized in any manner whatsoever by Phillips as delinquent, in default or as an undesirable Phillips' jobber.

In a letter dated June 16, 1972 to North Penn and other Phillips' jobbers in the Northeastern marketing area signed by the General Sales Manager of Phillips' Eastern Region Marketing Department, Phillips for the first time advised North Penn as follows:

You are advised that Phillips Petroleum Company has elected to withdraw from the marketing of branded automotive related products and distillates in its presently constituted Northeastern marketing area with the exception of operations presently conducted out of its Baltimore District, exclusive of the State of Delaware, and excepting a small portion of Southeastern Pennsylvania.

Phillips' withdrawal from this area will be effective in as orderly a manner as possible over the next 15 months with every possible consideration given to each of the Phillips' distributors involved.

Although present contracts with Phillips for the supply of gasoline and distillates will be completed by Phillips in accordance with their terms, including those which may extend beyond said 15-month period, existing contracts will not be extended beyond and will be terminated in accordance with the provisions thereof at the expiration of their current contract period.

\*    \*    \*    \*    \*    \*

Distributors who have contracts with Phillips, the current contract period for which will not expire on or prior to December 31, 1972, and who have or desire to arrange for another source of supply to commence on or after January 1, 1973, and before the normal expiration of their current contract period, may do so and Phillips will mutually agree to a cancellation of their contracts effective at

such time on or after January 1, 1973, as the distributor may desire.

The property and equipment owned by Phillips and used in its marketing operations in the areas involved will be disposed of in due course and Phillips is prepared to receive and consider offers for the purchase thereof from its distributors, as well as others, at any time after July 1, 1972.

Phillips regrets the necessity of withdrawing from this marketing area and the consequent termination of the business relationships it has had with the fine people and business in the petroleum industry in this part of the country. It is, however, a decision necessitated by the changing circumstances of our industry and the abilities of our company to fulfill its role as a supplier who will compliment the best interests of our customers and the general public.

By letter dated December 13, 1972, D. M. Forehand, Phillips' Division Manager, formally notified North Penn as follows:

You are hereby notified that Phillips Petroleum Company desires to and does hereby terminate, effective April 15, 1973, the following contracts, as same may have been heretofore amended, modified or supplemented, between Phillips Petroleum Company and North Penn Oil & Tire Co.:

1. Jobber Sales Contract dated December 6, 1961.

2. Lubricating Oil & Grease Contract dated December 6, 1961.

3. Jobber Sign Lease Agreement dated March 14, 1962.

4. All Credit Card Imprinter Agreements.

5. All contracts and agreements between Phillips Petroleum Company and North Penn Oil & Tire Co. which by their terms are dependent on the continuation of any of the above enumerated contracts.

This notice does not and shall not be construed to apply or affect in any manner whatsoever any Lease Agreement or Agreement of Sublease between Phillips Petroleum Company and North Penn Oil & Tire Co.

You are further advised that you are not authorized to accept Phillips Petroleum Company Credit Cards or credit cards issued by other companies, banks or firms heretofore authorized by Phillips, on sales of products or services made after April 15, 1973, for cash, on deferred terms or otherwise, and Phillips will not accept credit card invoices or purchase deferred receivables arising from any sales made after said date.

This is Phillips' formal notice of termination of which you were informed by our communication dated June 16, 1972, addressed to you as a Phillips' Jobber.

The Court holds that this notice was sufficient to effectuate a termination of the supply contracts enumerated above.

Subsequent to receipt of Phillips' June 16, 1972 letter (P&D 13), North Penn made reasonable and diligent efforts to locate an alternative source of gasoline. North Penn has contacted all potential suppliers known to it who could provide gasoline. These efforts included, *inter alia*, communications with Mobil, Chevron, Getty, American Oil Companies, and negotiations with Mobil and American Oil Companies (NT 249–253). However, up to the date of the hearing, North Penn had not as yet obtained an alternative supply of gasoline.

During the years after the original business relationship was created between Phillips and North Penn, North Penn entered into numerous long-term contracts with third persons with regard to construction, financing of improvements and the like, and supply of gasoline to service stations, many of which or all of which were done with the knowledge, consent and approval of Phillips and specifically with their aid and assistance in the form of providing the engineering and promotional services. More specifically, North Penn entered

into long-term financial commitments with regard to the Sharford Station, Leon Mills Station in Perkasie, the Grand View Sellersville Station and the Jet Car Wash in Doylestown. North Penn's commitments to supply stations with gasoline and related petroleum products extend in some cases up to and including 1981. North Penn supplies twenty-one service station accounts and fifteen commercial accounts with Phillips gasoline and petroleum products. North Penn has not given Notice of Termination of any of its agreements to its accounts and, therefore, may be committed to continue to deliver gasoline to those customers. However, Phillips has never required North Penn to enter into such agreements nor is it a party to them.

The contracts between Phillips and North Penn have never precluded North Penn from handling and marketing products manufactured and produced by persons other than Phillips. In fact, for a number of years, North Penn has handled and marketed heating oil, tires, batteries and accessories which were not manufactured or produced by Phillips.

North Penn has used and continues to use the bulk plant and warehouse premises which are the subject of the Long Form Lease, Short Form Lease and Agreement of Sublease for the receipt, storage, distribution and sale of products, e. g., heating oil, tires, batteries and accessories which it purchases, sells and handles under arrangements with persons other than Phillips.

North Penn contends that Phillips' decision to withdraw from the Northeastern area of the United States was pursuant to a conspiracy among the major oil companies to eliminate jobbers in an effort to gain price control, market allocation and stability. In support of this alleged conspiracy, North Penn relies on Phillips' announcement that its credit cards may be used at Exxon and Getty retail stations in the areas from which Phillips has withdrawn in the Northeastern part of the United States. There is not sufficient credible evidence in this record to enable this Court to find a reasonable probability that North Penn will succeed in proving the alleged conspiracy.

Phillips' available gasoline supplies during 1973, inclusive of its own refinery output and all other presently existing sources, are less than Phillips' requirements for gasoline supply, based upon obligations under existing contracts and Phillips' own requirements. This does not take into account the usual annual increase in demand which has been an average of 6% for the industry. Furthermore, it includes jobber requirements in areas outside the Northeastern marketing area at the maximums in their contracts and does not include quantities in excess thereof which in the past said jobbers may have purchased. Phillips will not have a sufficient supply of gasoline to meet its known requirements. Although Phillips strengthened its world-wide crude oil production *potential* in 1972, Phillips' crude oil refining capacity now and for the foreseeable future will be inadequate to meet Phillips' known requirements for gasoline in the United States.

Phillips is withdrawing from the portion of its former Northeastern marketing area consisting of Maine, Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Delaware, Pennsylvania (excluding south-central Pennsylvania) and part of West Virginia. Phillips is not withdrawing from that portion of its former Northeastern marketing area which consists of south-central Pennsylvania, Maryland and part of West Virginia.

In the withdrawal area, Phillips has been and is terminating all supply contracts (for branded and unbranded gasoline and lubricating oils and greases) with all jobbers and dealers as promptly as possible consistent with the terms of those contracts; offering for sale and selling Phillips' interests in all Phillips-owned and Phillips-leased retail outlets

(branded and unbranded); and closing all Phillips-owned and Phillips-leased salary operated retail outlets (branded and unbranded). There is not sufficient credible evidence in this record to enable this Court to find a reasonable probability that North Penn will succeed in proving that Phillips' decision to cease the marketing of gasoline and other petroleum products in the withdrawal area and to continue in a portion of the Northeastern marketing area was prompted by a desire to avoid, evade or violate the antitrust laws.

Phillips' termination of jobber sales contracts, leases and distributorships has led to a number of recent decisions in the courts throughout the country. See Aranosian Oil Company, Inc. v. Phillips Petroleum Company, C.A. No. 73–62 (D.N.H. April 2, 1973); Giant Service Stations, Inc. v. Phillips Petroleum Co., C.A. No. 73–126 (D.Ariz. Mar. 23, 1973); Lapera Oil Co., Inc. v. Phillips Petroleum Co., C.A. No. 72–652 (M.D.Pa. Dec. 30, 1972); Kimber Petroleum Co. v. Phillips Petroleum Company, Docket No. C–693–72 (N.J.Super. Chancery Division, Dec. 8, 1972).

In the *Giant Service Stations* case, Phillips attempted to terminate an oral jobber sales contract on twenty-one days' notice. The United States District Court for the District of Arizona issued a preliminary injunction restraining Phillips from terminating the contract. In the case before us, North Penn's jobber contract specifically provided that it could be terminated by either party on 90 days' notice. In the Arizona case, there was no written contract and the basis for the preliminary injunction was the allegation that there was an oral agreement to supply the jobber for as long as Phillips was supplying its own stations in the area.

In *Kimber*, Phillips attempted to terminate the distributor's lease of service stations while continuing the distributors' obligation to purchase its petroleum products. The Superior Court of New Jersey, Chancery Division, issued an interlocutory injunction restraining the sale or lease of the service stations based on an alleged violation of the New Jersey Franchises Practices Act. Neither the law nor the facts in *Kimber* are similar to the instant case.

In *Lapera,* Phillips, pursuant to its determination to withdraw from the Northeastern marketing area, gave notice of termination of its written jobber's sales contract with terms similar to those in the instant case. The United States District Court for the Middle District of Pennsylvania, Muir, J., denied plaintiff's motion for a temporary restraining order on the ground of no likelihood of eventual success on the merits.

In *Aranosian Oil*, Phillips, pursuant to its determination to withdraw from the Northeastern marketing area, gave notice of termination of its written jobber sales contract. The United States District Court for the District of New Hampshire denied plaintiff's request for a preliminary injunction, finding, *inter alia*, that the plaintiff had not established a reasonable likelihood of success on the merits.

■ ■ The standards for the issuance of a preliminary injunction require the moving party to demonstrate, *inter alia*, a reasonable probability of eventual success on the merits and irreparable injury *pendente lite*. The district court has broad discretion, since its task involves weighing the benefits and burdens that granting or denying the injunction will have on each of the parties and the public. Penn Galvanizing Company v. Lukens Steel Co., 468 F.2d 1021 (3rd Cir. 1972). In applying these standards to the instant case, we shall consider separately each of the counts in North Penn's amended complaint.

The amended complaint in this action seeks relief under five counts. In the first count North Penn contends that Phillips is obligated pursuant to contract to continue to supply gasoline after April 15, 1973. North Penn contends that the basis of this contractual agreement is an alleged November 29, 1961

oral agreement between it and Phillips. An alternate contention for the conclusion that North Penn is entitled to a continued supply of gasoline is that the various written contracts between the parties are interrelated and mutually dependent. North Penn also contends that the ninety-day termination clause in the jobber supply contract is unconscionable under Section 2–302 of the Uniform Commercial Code.

▪▪ Our finding that North Penn has failed to establish by sufficient credible evidence a reasonable probability that it will succeed in proving an oral agreement on November 29, 1961, is dispositive, at the preliminary injunction stage, of North Penn's contention that there was an oral agreement, requiring Phillips to continue to supply petroleum products beyond April 15, 1973. Furthermore, the parole evidence rule set forth in Section 2–202 of the Uniform Commercial Code provides that written contractual terms may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. 12A P.S. § 2–202. This section permits oral evidence of *consistent* additional terms to a contract to explain or supplement the contract but only where the court finds that the written terms were not intended as a complete and exclusive statement of the contract. Here, parole evidence is offered not as consistent explanation, but in absolute derogation of the termination date set forth in the express language of the contracts.

▪ In support of North Penn's contention that the written contracts between the parties are mutually dependent and interrelated, North Penn relies on the case of Kimber Petroleum Corporation v. Phillips Petroleum Co., *supra*. Neither the law nor the facts in *Kimber* are similar to the instant case. The principal fallacy in the argument that the contracts are mutually dependent has been the failure to demonstrate that a relationship exists between the lease agreements and the supply contracts. Other Phillips jobbers who own their own

bulk plants have similar supply contracts even though there is no lease-leaseback arrangement. If the supply contract is terminated, North Penn can still use the bulk plant facilities for non-Phillips products (as it has been doing for heating oil). This is clearly what North Penn intended to do until it discovered that it could not find another gasoline supplier because of the present shortage of gasoline. The length of the lease terms are related to the financing, not to the supply contracts. Moreover, although both the lease agreements and the supply contracts obviously constitute two transactions in the overall relationship between Phillips and North Penn, there is no reason that either cannot stand alone. Neither supplies terms missing in the other. It would seem to have been to North Penn's advantage not to be committed on supply contracts for 15-year and 20-year terms. In fact, North Penn has in no way indicated that if it had wished to terminate the supply contracts on April 15, 1965, or any April 15th thereafter, it could not have done so.

A case very similar is Jones v. Pepsi Cola Company, 223 F.Supp. 650 (D.Neb. 1963). In the *Jones* case, a partnership had two contracts with Pepsi Cola designated "exclusive bottling appointment" and "exclusive fountain syrup appointment." The assignability provisions in the two contracts differed although both contracts were executed between the same parties at the same time and constituted separate phases of an overall distribution relationship between Pepsi and its bottler. Pepsi urged the Court to read the two contracts together and hold that the bottling contract was not assignable without the consent of Pepsi, in order to conform it with the assignability provision in the fountain syrup contract. The court stated:

In the case at bar the two contracts refer to different things. One provides for the distribution of fountain syrup. The other has as its subject matter the bottling and sale of Pepsi

Cola. *However, even if they were to be construed together, to do so would only serve to establish the difference in the provisions dealing with the assignability of the two contracts.* It is conceivable that the provisions for the two contracts would be different. The expense involved in establishing a bottling plant for soft drinks is much greater than the expense of distributing fountain syrup due to the difference in equipment and personnel needed to perform a bottling operation as opposed to the distribution of syrup. (Emphasis supplied) (223 F.Supp. at 656).

Since there is no business reason why the leases could not be for longer terms than the supply contracts, and since the parties in their letters regarding the leases referred to the supply contracts as three-year contracts, and since it was, at least at the time the supply contracts were made, actually to North Penn's advantage not to have 15-year or 20-year supply contracts, it would be totally unreasonable and fly in the face of the clear intention of the parties for the Court at this time to hold that in fact the supply contracts did have 15-year terms or 20-year terms.

■ It is contended by North Penn that the practice of linking short term Jobbers' supply contracts with long-term financing of supply facilities and stations constitutes an unconscionable contract and the ninety-day notice provision in the Jobbers' supply contract is an unconscionable clause therein. North Penn further contends that Phillips' attempted exercise of this ninety-day notice termination clause must be enjoined by this Court in order to avoid the unconscionable result of complete termination of its business leaving it with long-standing financial obligations incurred at the instance of Phillips. On this point, North Penn relies on the New Jersey case of Shell Oil Co. v. Marinello, 120 N.J.Super. 357, 294 A.2d 253 (1972). In *Marinello*, Shell Oil attempted to terminate year-to-year service station leases pursuant to lease clauses authorizing termi-

nation by Shell upon 30 days' notice. The original leases ran for three-year terms and were automatically renewed from year to year. The New Jersey Superior Court disagreed with Shell and held that Shell was bound to an implied covenant to renew these leases as long as the dealer substantially performed its contractual obligations thereunder. However, in a companion case in the United States District Court for the District of New Jersey, Marinello v. Shell Oil Co., C.A. 1506–72 (Dec. 13, 1972), Chief Judge Coolahan granted summary judgment on the ground that Shell had the right to terminate its service station lease with William Marinello, brother of the defendant in the state court action, and found that the contract was not unconscionable.

Regarding the state court action, Judge Coolahan stated:

In a companion case to the one at bar, Shell Oil Co. v. Marinello [1972 Trade Cases ¶ 74,178], 120 N.J.Super. 357 [294 A.2d 253] (Law Div.1972), the Superior Court of New Jersey, Law Division, Bergen County, sustained the contentions of the franchisee in a case whose facts closely parallel those presently before us. *Shell contends that the two cases are distinguishable.* I find it unnecessary to reach this question, and I feel that the State Court decision is contrary to various principles which have been established by the New Jersey Supreme Court with definiteness and finality. For this reason, I am bound not to pay heed to that opinion.

Judge Coolahan's decision is sound. Furthermore, the facts in the case before us are even more persuasive in favor of a finding that the Jobber Contract is not unconscionable. The termination of North Penn's supply contracts is based on Phillips' withdrawal from the Northeastern area. Thus, Phillips can in no way be said to be attempting to take over for its own benefit the business or good will which North Penn may have built up. Furthermore, the argument that this type of termination pro-

vision is unconscionable under the Uniform Commercial Code has been specifically rejected in other decisions. Sinkoff Beverage Co. v. Joseph Schlitz Brewing Co., 51 Misc.2d 446, 273 N.Y.S.2d 364 (N.Y.Sup.Ct., Suffolk County 1966); Division of Triple T. Service, Inc. v. Mobil Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191 (N.Y.Sup.Ct. West Chester County 1969), affirmed 34 A.D. 2d 618, 311 N.Y.S.2d 961 (App.Div.1970).

The only reason termination of the Jobber Sales Contract has had any adverse effect upon North Penn is that several months after Phillips' decision to withdraw from its Northeastern gasoline marketing area, and after Phillips notified North Penn that the withdrawal would result in the termination of North Penn's supply contracts, a gasoline shortage developed. The termination provisions of the supply contracts were reasonable at the time they were entered into and were actually favorable to North Penn, because the clauses provided the possibility for North Penn's changing suppliers if North Penn could arrange a better deal with another company, just as North Penn had changed from Texaco to Phillips when Phillips provided it with a better deal.

■■ North Penn further contends that the exercise of the termination clause in the instant case is in violation of 12A P.S. § 2–615(a). Where availability of adequate supply is a "contingency, the non-occurrence of which was a basic assumption on which the contract was made", 12A P.S. § 2–615(a) of the Pennsylvania Uniform Commercial Code requires a seller to make a reasonable allocation of such supply among his customers. 12A P.S. § 2–615(b) provides in relevant part:

(b) Where the causes mentioned in paragraph (a) (those recited above) affect only a part of the seller's capacity to perform, *he must allocate production and deliveries among his customers* . . . . . He may so allocate in any manner which is fair and reasonable. (emphasis supplied).

To hold that this section prohibits the valid termination of a contract pursuant to its terms would be to completely change its meaning. It is apparent that this section was intended to partially excuse performance of existing contracts when full performance of those contracts became impossible. It was not intended to prevent a party from terminating a contract in accordance with its terms.

■ In counts two and five of the complaint, North Penn alleges that Phillips has discriminated against North Penn by attempting to terminate North Penn while continuing to supply other jobbers, in violation of the Robinson Patman Act, 15 U.S.C. § 13(e). North Penn also alleges that Phillips' refusal to extend its supply contract is pursuant to a conspiracy with other major oil companies to eliminate competition between branded and unbranded retail gasoline outlets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. North Penn has failed to produce sufficient credible evidence to enable this court to find a reasonable probability that it will succeed in proving any violations of the antitrust laws.

■ In this case, there is no evidence to indicate that Phillips is attempting to make the same sales through an alternative distribution system. For economic reasons, Phillips is abandoning this area. Phillips' withdrawal from Northeastern gasoline marketing area under the evidence at this preliminary hearing does not present a violation of the antitrust laws. While the refusals of a number of suppliers acting in concert to deal would be a violation, the mere fact of refusals is not evidence that they are acting in concert in violation of the antitrust laws. Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3d Cir. 1961). *Delaware Valley Marine Supply Co.* is the leading authority in this Circuit on the evidence required to show a concerted refusal to deal. In that case, the plaintiff attempted to obtained cigarettes for resale from defendant cigarette

manufacturers. Over a period of time each defendant refused to sell to plaintiff. In upholding the District Court's direction of a verdict for defendants at the conclusion of plaintiff's case, the Court of Appeals noted that there was evidence sufficient to support a jury finding of conscious parallelism but that the consciously uniform business behavior of the kind shown, standing alone, was not enough to sustain a finding of conspiracy. *Supra,* at 205.

The present case is in some respects similar to *Delaware Valley Marine Supply Co.* Phillips has demonstrated convincing business reasons for its withdrawal from gasoline marketing in the Northeastern region. Far from being contradictory to Phillips' self-interests, the withdrawal makes economic sense for Phillips. There is no evidence of coercion. Moreover, after the termination notice, other oil companies negotiated seriously and in good faith North Penn's proposal that it become a jobber for them. The evidence in the present case is no stronger than the evidence in *Delaware Valley Marine Supply Co.* It must be remembered that in that case our Circuit Court of Appeals upheld a directed verdict in favor of defendants at the conclusion of plaintiff's case. If such evidence is insufficient even to get to the jury, North Penn cannot successfully argue that it supports a finding of clear probability of eventual success on the merits.

The courts have consistently required *more than the fact of refusals to deal* by several companies to make out a case of a concerted refusal to deal. First National Bank v. Cities Service, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656 (9th Cir. 1963). If all that North Penn can show is that Phillips withdrew from Northeastern gasoline marketing, that other oil companies may have withdrawn from unprofitable marketing operations in other parts of the United States, and that North Penn has been unable to acquire a new source of supply because of the current shortage of gasoline, there is insufficient evidence of a conspiracy in violation of the Sherman Act to get to a jury, much less to sustain a finding of a clear probability of eventual success on the merits.

The basis for North Penn's contention that Phillips conspired with other major oil companies to eliminate independent branded jobbers is also without foundation, at this preliminary injunction stage of the case. The only credible evidence which North Penn has produced in support of the existence of such a conspiracy is that Phillips has entered into exchange credit card arrangements with Exxon and Getty in the withdrawal area. Parallel conduct is clearly not sufficient to make out a conspiracy without some showing that the actions taken appear to be contradictory to the self-interests of the parties or that actions of one party are rational only if the other parties to the alleged conspiracy act in a similar manner. Furthermore, participation by Phillips in such a conspiracy would appear to be adverse to Phillips' economic interests. Phillips is a branded jobber-oriented company; 67.5% of all gasoline distributed by Phillips east of the Rocky Mountains is sold to Phillips' branded jobbers.

Counts three and four of North Penn's complaint allege that Phillips should be estopped from terminating its supply of petroleum products to North Penn. Count three is based on the alleged existence of an industry custom not to terminate a jobber except for good cause. Count four alleges, as a basis for estoppel, that North Penn has entered into long-term supply commitments with third parties in reasonable reliance on Phillips' continued supply of gasoline. With respect to both counts three and four, North Penn contends that the instant case is a classic situation for the application of estoppel,

based on Phillips' alleged promise that they would continue to honor the jobber sales agreement throughout the term of the financing agreement for the bulk storage facility. North Penn also alleges that this promise, coupled with a course of dealings between the parties relating to Phillips' encouragement of additional capital investments by North Penn, created a reasonable expectation on the part of North Penn that Phillips would not terminate its supply contracts. When Phillips entered the gasoline market in the Northeastern region, its intent was undoubtedly to make as strong a competitive penetration as possible. Those such as North Penn who hoped to substantially benefit economically from Phillips' rise to the top in the Northeastern region, after initial success, have now been disappointed in their expectations. But a disappointed expectation does not give rise to an estoppel.

As outlined by Judge Becker in In Re Flying W Airways, Inc., 341 F. Supp. 26 (E.D.Pa.1972), "the doctrine of promissory estoppel, [as set forth in Section 90 in the Restatement of Law,] Contracts, holds that: (1) a promise (2) which the promisor should reasonably expect to induce (3) action or forbearance of a definite and substantial character (4) on the part of the promisee (5) and which does induce such action or forbearance, is binding (6) if injustice can be avoided only by enforcement of the promise. [(at 74).]" In this case, as we previously found, there is no reasonable probability that North Penn will succeed in proving that there was a "promise."

It was undoubtedly the hope of Phillips that it would be able to sell ever increasing amounts of gasoline products through North Penn to gasoline users. However, recognizing the vicissitudes of business life, Phillips specifically provided in its Jobber Sales Contracts and Oil and Grease Contracts for the right of termination.

North Penn suggests a "promise" by alleging that it took various investment steps which would not have been taken except for North Penn's reliance on the promise. There is no proof that these steps of business expansion were taken in reliance upon any promise by Phillips, but it is more likely that they were taken in reliance upon an overall competitive business climate in gasoline marketing whereby the major oil companies were competing for distributors. North Penn's investment decisions were made in reliance upon the increasing demand for gasoline products and concomitant sales opportunities. The expectations do not create an estoppel.

In conclusion, while there is sufficient credible evidence in this record showing that North Penn may suffer irreparable injury as a result of Phillips having terminated its supply contracts and as a result of the present gasoline shortage, such irreparable injury does not provide a legally sufficient basis for this Court to grant a preliminary injunction. North Penn has failed to demonstrate a reasonable probability of eventual success on the merits. Since North Penn has failed to establish an essential element for the issuance of a preliminary injunction, the Court concludes that a preliminary injunction is inappropriate in this case. This Memorandum and Order shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.