**THERMICE CORPORATION**

v.

**VISTRON CORPORATION and Airco, Inc.**

**Civ. A. No. 79–2229.**

United States District Court,
E. D. Pennsylvania.

July 18, 1979.

Franklin Poul, Wolf, Block, Schorr & Sol-is-Cohen, Philadelphia, Pa., Michael K. Stanton, Weil, Gotshal & Manges, New York City, for plaintiff.

Patrick T. Ryan, Kenneth C. Frazier, Drinker, Biddle & Reath, Philadelphia, Pa., for Airco.

Larrick B. Stapleton, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Vistron.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff, Thermice Corporation (Thermice), a Pennsylvania corporation with its principal place of business in Pennsylvania, brings this action against defendants Vistron Corporation (Vistron), an Ohio corporation with its principal place of business in Ohio, and Airco, Inc. (Airco), a Delaware corporation with its principal place of business in New Jersey, seeking (1) to enjoin Vistron and Airco from making available to Airco a supply of carbon dioxide in accordance with a contract which Vistron and Airco contend requires Vistron to furnish Airco 69% of its available supply, and (2) to enjoin Vistron to make available to Thermice a supply of carbon dioxide in accordance with a contract between Vistron and Thermice which Thermice contends requires Vistron to make available to it quantities of carbon dioxide in amounts far greater than 31% of its available supply. On June 27, 1979, this Court issued a temporary restraining order.[1] Presently before the Court is plaintiff's motion for a preliminary injunction. A hearing was held concerning this motion on July 9, 1979. For the reasons hereinafter discussed, plaintiff's motion for a preliminary injunction is denied.

1. The temporary restraining order was issued for a period of ten (10) days, commencing at 12:01 a. m. on Thursday, June 28, 1979 and terminating at 12:01 a. m. on Sunday, July 8, 1979, during which time Vistron was ordered to distribute its available supply of carbon dioxide on the basis of 50% to Thermice and 50% to Airco. The parties have agreed that this temporary restraining order shall remain in effect until the Court has ruled on plaintiff's motion for a preliminary injunction.

Plaintiff, Thermice, a subsidiary of Publicker Industries, Inc., is engaged in the manufacture and distribution of carbon dioxide, with its sole manufacturing facility in Muscatine, Iowa. Thermice manufactures and distributes carbon dioxide in the Midwestern marketing area, and distributes carbon dioxide in the Eastern marketing area. Thermice has approximately 120 customers in its Eastern market, an area which includes Pennsylvania, Connecticut, Rhode Island, Maine, Massachusetts, New Hampshire, New York, New Jersey, West Virginia, Delaware and Maryland. Customers in these states are supplied almost exclusively with carbon dioxide which Thermice purchases from Vistron under a long-term contract.

At the hearing on July 9, 1979, Thermice presented the testimony of Robert P. Richards, Executive Vice President of Thermice, and Joseph T. Brennan, National Distribution Manager of Thermice. Mr. Richards testified that Thermice requires more than 300 tons per day of carbon dioxide in addition to that produced at its Iowa plant in order to meet its contractual commitments. More than 200 tons per day are distributed in the Midwest region and approximately 100 tons per day are distributed in the Eastern region. He also testified that, in 1978, Thermice's Iowa plant produced approximately 37% of Thermice's total requirements of carbon dioxide, and Vistron provided approximately 53%. The remaining 10% was sold to Thermice by a Terre Haute, Indiana plant or purchased on the spot market.

Defendant Airco is engaged in the manufacture and distribution of carbon dioxide and is one of Thermice's competitors in the Eastern marketing area.[2] It has approximately 375 customers in the Eastern United States. Airco has a long-term supply contract for carbon dioxide with Vistron.

A cease and desist order was entered against Airco by the Federal Trade Commission, *In the Matter of Pure Carbonic,*

*Inc., et al.,* 44 F.T.C. 1029, 1072 (1948), enjoining Airco, among others, from entering into or carrying out agreements with manufacturers of carbon dioxide whereby it would agree to purchase the entire output or a substantial portion of their output. Two consent decrees entered against Airco in settlement of antitrust suits brought by the Department of Justice, *United States v. Liquid Carbonic Corp.,* 1952 Trade Cas. ¶ 67,248 (E.D.N.Y.1952) and *United States v. General Dynamics Corp.,* 1962 Trade Cas. ¶ 70,401 (E.D.N.Y.1962), included provisions enjoining Airco from taking action which would limit or restrict the production or sale of carbon dioxide.

Defendant Vistron operates an ammonia plant in Lima, Ohio and produces carbon dioxide as a by-product of the manufacture of ammonia. After using a certain quantity of carbon dioxide in its internal processes, Vistron sells the remainder. At full capacity Vistron produces approximately 550 tons of carbon dioxide per day, seven days per week, eleven months per year (the plant closes one month per year for maintenance). Vistron has long-term contracts only with Thermice and Airco for the purchase of carbon dioxide by them.

Shortages are a fact of life in the carbon dioxide industry. Because carbon dioxide is produced as a by-product in the manufacture of unrelated products, its supply varies according to the demand for the main product and not according to the demand for carbon dioxide. Shortages occur most frequently during periods when plants are shut down for maintenance work and during the summer months when demand for carbon dioxide is at its peak. To help deal with these shortages, carbon dioxide is available on a spot market whereby a carbon dioxide distributor can purchase products from other carbon dioxide distributors at a set price of $30 per ton. Availability of carbon dioxide on the spot market varies on a daily basis.

**2.** Other competitors are Liquid Carbonic, Cardox, and Air Products. Airco, Liquid Carbonic, and Cardox account for over 90% of the carbon dioxide sales in the Eastern market. Thermice accounts for approximately 7%.

On July 20, 1970 Vistron and Airco entered into a written agreement for the purchase by Airco of quantities of carbon dioxide manufactured by Vistron at its Ohio plant. With respect to allocation, the contract stated:

Airco understands that Vistron has concurrent contracts to supply liquid and solid product from the facility. In accordance with these commitments and irrespective of any other provision hereof, Vistron will apportion to Airco sixty-nine (69) percent of the available supply of liquid product.

This contract was amended in part by an agreement between Vistron and Airco dated and to become effective on January 1, 1977. The price provision was amended to make the base price equal to $12 per ton. There was no amendment to the allocation provision of the original contract.

On October 8, 1970 Vistron and Thermice entered into a written contract for the purchase by Thermice of quantities of carbon dioxide manufactured by Vistron at the same Ohio plant. Paragraph 5 of this contract provided that "Vistron will make available to Thermice a maximum of 180 tons per day." [3] In Paragraph 10a of the addendum to the original contract, the allocation provision stated:

Vistron will apportion the available supply of liquid carbon dioxide to each contract customer as of the date of the execution of this contract in direct proportion to its minimum commitment as outlined in ¶ 5. Quantities.

Paragraph 14c provided for a limit to the amount of carbon dioxide that Vistron has to supply to Thermice:

Vistron shall not be required to deliver a weekly average of more than one hundred eighty (180) tons of product per day and in no event more than the actual allocated production at the Facility for any month plus the amount of production held in allocated inventory by Vistron at the beginning of such month.

This contract was amended in part by an agreement dated and to become effective on January 1, 1977. Under this agreement, the price provision was amended to make the base price $12.12 per ton. Paragraph 5 was amended to provide that "Vistron will make available to Thermice a maximum of 270 tons per day." Paragraph 10a of the original contract was replaced with the following:

The available supply of carbon dioxide will be apportioned by Vistron to each contract customer based on its individual commitments as a percent of total commitments and adjusted for recent actual taking by each such customer against its individual commitment.

The term "recent actual taking" is not defined in either the original contract or the amendment of January 1, 1977. There was no amendment concerning Paragraph 14c of the original contract, which provided that Vistron only had to provide to Thermice an average of 180 tons per day of carbon dioxide.

Prior to the amendments of January 1, 1977, during periods of allocation when carbon dioxide was in short supply, Airco received 69% of the available product and Thermice received 31% in accordance with the original contracts. Subsequent to these amendments and until May 16, 1979, Vistron allocated carbon dioxide to Thermice during periods of short supply on the basis of its recent actual taking. Thermice presented testimony that the details of the "recent take" formula were provided to it orally by Jim Dietz, plant manager of Vistron's Ohio plant. During the allocation periods between January 1, 1977 and May 16, 1979, Thermice received between 44% and 56% of Vistron's available supply, and Airco received less than the 69% specified in its contract with Vistron. On or about May 17, 1979, Airco demanded that it receive the 69% called for in the allocation provision of its contract during short supply periods. In the short supply period from May 16, 1979 to May 29, 1979, Thermice was allocated 31% of Vistron's available supply of carbon

---

3. One hundred eighty tons is 32.7% of the daily production of 550 tons by Vistron.

dioxide and Airco was allocated 69%. Thermice contends that, on the basis of the "recent take" formula, it was entitled to 59% of Vistron's available supply during the May 16 to May 29 period. During the most recent allocation period, from June 11, 1979 to June 19, 1979 (the day on which the complaint was filed), Thermice was allocated 31%, and it contends that it was entitled to 56% of Vistron's available supply in accordance with the "recent take" formula. Thermice seeks a preliminary injunction which will order Vistron to make available to it during periods of short supply quantities of carbon dioxide on the basis of its interpretation of the "recent take" provision of the contract, and on the further basis that Airco is in violation of a cease and desist order and two consent decrees, and that Vistron and Airco are committing antitrust violations.

To obtain a preliminary injunction, the moving party must demonstrate (1) a reasonable probability of eventual success in the litigation, and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. While the burden rests upon the moving party to make the above two requisite showings, the District Court must take into account whenever relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Constructor's Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975). The District Court has broad discretion since its task involves weighing the benefits and burdens that granting or denying the injunction will have on each of the parties and the public. *Penn Galvanizing Company v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir. 1972); *North Penn Oil and Tire Co. v. Phillips Petroleum Co.*, 358 F.Supp. 908, 919 (E.D.Pa.1973).

Thermice contends that it has a reasonable probability of eventual success in this litigation. It bases its claim of eventual success upon the following:

(1) That Vistron breached its contract with Thermice by not allocating carbon dioxide in accordance with the "recent take" formula.

(2) That Airco, in violation of consent decrees entered into between Airco and the United States in antitrust actions before the United States District Court, E.D.N.Y., induced Vistron to breach the terms of its contract with Thermice by reducing substantially the quantity of carbon dioxide available to Thermice from Vistron.

(3) That Vistron and Airco entered into combinations and conspiracies in violation of Sections 1 and 2 of the Act of July 2, 1890 (Sherman Act), 15 U.S.C. §§ 1, 2, by which Vistron agreed with Airco's demands that Vistron withhold deliveries of carbon dioxide to Thermice and make them instead to Airco, including deliveries during periods of allocation.

(4) That Airco violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in activities with the intent of achieving a monopoly in the sales and distribution of carbon dioxide in interstate commerce, including marketing areas in the Eastern states.

(5) That the contract between Vistron and Airco is illegal because it is in violation of the consent decrees, and because it forms part and parcel of a conspiracy to restrain trade and monopolize commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

Thermice also contends that it will be irreparably injured *pendente lite* in the event a preliminary injunction is not granted. It claims that by being limited to 31% of Vistron's supply of carbon dioxide during periods of allocation, it will be irreparably injured in that it will be forced to withdraw from the Eastern marketing area.[4]

---

4. Robert P. Richards, Executive Vice-President, in his affidavit of June 19, 1979, claims that "the loss of Thermice's customers in the Eastern states geographic region will cause catastrophic losses, will drive Thermice out of business in those areas, and may mean the total demise of Thermice's business."

Thermice, as the applicant for a preliminary injunction, has the burden of showing that it will be irreparably injured *pendente lite. A. O. Smith v. FTC*, 530 F.2d 515 (3d Cir. 1976). As to what is meant by irreparable injury, the Court in *A. O. Smith, supra* at 525 stated:

> [T]he requisite is that the feared injury or harm be irreparable—not merely serious or substantial. "The word means that which cannot be repaired, retrieved, put down again, atoned for . . . .. Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule; the injury must be of a peculiar nature, so that compensation in money cannot atone for it . . . ." [Citation omitted.] "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." [Citation omitted.]

By being limited to 31% of Vistron's supply of carbon dioxide during allocation periods and not being able to receive during such allocation periods a supply based upon its "recent take" formula, Thermice contends that during such periods of allocation it will not be able to serve its 120 customers in its Eastern market and will lose these customers. The testimony presented by Thermice shows that the application of the "recent take" formula during the periods of allocation in 1978 and early 1979 provided Thermice with 44% to 56% of Vistron's available supply. Mr. Richards of Thermice testified that allocation periods come into being whenever Vistron's inventory of carbon dioxide is at a low level. The evidence shows that allocation periods are sporadic. When the supply from Vistron is not being allocated, Thermice can obtain from Vistron as much carbon dioxide as it needs, up to the maximum of 270 tons per day pursuant to the amended contract. During periods of allocation, Airco does not always take 69% of the available supply. Thermice's own figures indicate that, during the May 16 to May 29 allocation period, Airco received 2010 tons and Thermice received 2,730 tons—much more than 31%. The evidence revealed that, even during allocation periods, there is some carbon dioxide available on a day to day basis on the spot market. Mr. Richards testified further that Thermice requires about 100 tons per day to supply its 120 customers in its Eastern market and that its 120 customers in the Eastern market account for 27% of Thermice's total sales of carbon dioxide. In 1978 Thermice manufactured at its plant in Muscatine, Iowa about 37% of the carbon dioxide which it distributed, and about 53% came from Vistron, with the remaining 10% coming from other sources. Thermice admitted that it is presently selling about 40 tons per day to Liquid Air, another company engaged in the business of distributing carbon dioxide.

The record shows that most carbon dioxide is produced as a by-product of some industrial manufacturing operation. Ammonia plants have been the chief source of supply. Therefore, the supply of carbon dioxide varies in relation to the demand for other products, and not on the basis of the demand for carbon dioxide—the demand for which reaches its peak in the summer months. A limited supply is therefore a fact of life in the business of distributing carbon dioxide. Markets for the distribution of carbon dioxide are generally regional in nature because of the substantial cost in transporting the product. Thermice has been transporting most of the carbon dioxide it distributes to its Eastern market from Vistron's plant in Ohio by rail and truck directly to its Eastern customers. Other sources of supply are available to Thermice, but the cost of transportation makes such sources more expensive than obtaining it from the Vistron plant in Ohio. During the course of the hearing, Airco testified that it was willing to make available to Thermice a supply of carbon dioxide from its plant at Yazoo, Mississippi and from Augusta, Georgia. In addition, it was brought out that Publicker, the parent corporation of Thermice, owns a plant in Philadelphia which has in the past been used for the manufacture of carbon dioxide, but is not being operated at the present time.

No credible evidence was produced at the hearing showing that Thermice will be irreparably injured; nor is there evidence to support a finding that the 31% limitation of Vistron's supply during periods of allocation will drive Thermice out of the Eastern market and/or bring about the demise of Thermice. The evidence presented does not support a finding that Thermice will lose all its 120 customers in its Eastern market—27% of its business. While it is obvious that Thermice receives less carbon dioxide from Vistron during short supply periods whenever Vistron allocates 31% of its available supply, there is no credible evidence that Thermice's supply will be limited to the extent that it will be forced to withdraw from its Eastern market. The record does not show that Thermice has lost any of its customers in the East since Vistron has insisted on the 31% allocation. The testimony does support a finding that in the event Thermice is eventually successful on the merits in this litigation, any injury it suffers will be measurable and compensable by money damages. To the extent that Thermice must obtain a new supply at a higher price, such increased costs would in all likelihood be compensable in money damages, in the event Thermice prevails on the merits. Therefore, since its losses are calculable in money damages, Thermice has not established irreparable injury. *A. L. K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761 (3d Cir. 1971); *Graham v. Triangle Publications*, 344 F.2d 775 (3d Cir. 1965). As stated by the Court in *Graham*, *supra* at 776: "This is not a case of the claimed destruction of a business enterprise containing such speculative elements that they are not susceptible to ready ascertainment in damages."

Furthermore, there is no basis in the record which would support a determination that the public or other interested parties will be harmed by the Court's denial of the preliminary injunction.

The Court has considered the contentions of Thermice that (a) Vistron has breached its contract, (b) Airco is in violation of its consent decrees, (c) Vistron and Airco committed antitrust violations by combining and conspiring to deprive Thermice of carbon dioxide, (d) Airco is intending to achieve monopoly, and (e) the contract between Vistron and Airco is illegal. The Court does not, however, find it necessary to make the determination that Thermice has demonstrated a reasonable probability of eventual success on the merits in connection with one or more of its contentions in view of our finding stated above that Thermice has not carried its burden of showing irreparable injury. The failure of an applicant for a preliminary injunction to show irreparable injury is a sufficient basis on which to deny a preliminary injunction. "A finding of no irreparable harm is itself sufficient to uphold the district court's denial of a preliminary injunction as a proper exercise of discretion." *Commonwealth of Pa. ex rel. Creamer v. U. S. Dept. of Agriculture*, 469 F.2d 1387, 1388 (3d Cir. 1972); *United States v. Commonwealth of Pa.*, 533 F.2d 107, 110 (3d Cir. 1976); *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976).

This memorandum is in lieu of findings of fact and conclusions of law, and contains the reasons for the Court's Order of July 16, 1979 which denied plaintiff's motion for a preliminary injunction.